AR Broadcasting Holdings, Inc.[1] ("AR Holdings"), AR Broadcasting, LLC ("StickCo"), AR Licensing, LLC ("StickCo Licensing" and together with AR Holdings and StickCo, collectively, the "Debtors" or the "Company") are sending you this document and the accompanying materials (the "Disclosure Statement") because you may be a creditor entitled to vote to approve the *Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated October 28, 2011, as the same may be amended from time to time (the "Plan").

The Company intends to file voluntary reorganization cases under chapter 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"), to implement the Plan (the "Chapter 11 Cases"). Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Company files the Chapter 11 Cases, it will seek an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

---

## DISCLOSURE STATEMENT FOR THE DEBTORS' PREPACKAGED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE[2]

### DATED OCTOBER 28, 2011

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date (as defined below) will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions as well as, to the extent applicable, section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the solicitation of acceptances of the Plan from holders of claims and interests (the "Solicitation").

The Plan has not been approved or disapproved by the SEC, any state securities commission, or the Bankruptcy Court and neither the SEC, any state securities commission, nor the Bankruptcy Court has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

---

[1] On or before the Petition Date, CMP Susquehanna Holdings Corp. shall change its name to AR Broadcasting Holdings, Inc., CMP KC, LLC shall change its name to AR Broadcasting, LLC and CMP KC Licensing, LLC shall change its name to AR Licensing, LLC.

[2] The Debtors in these Chapter 11 Cases are: AR Broadcasting Holdings, Inc., AR Broadcasting, LLC and AR Licensing, LLC. The location of the Debtors' corporate headquarters and the service address for all Debtors is: AR Broadcasting, LLC, c/o Cumulus Media Partners, LLC, 3280 Peachtree Road, Suite 2300, Atlanta, GA 30305.

This Disclosure Statement and the information set forth herein is confidential. This Disclosure Statement contains material non-public information concerning the Company, its subsidiaries, and their respective securities. Each recipient hereby acknowledges that (a) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) it is familiar with the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential information in contravention of the Exchange Act or any of its rules and regulations, including Rule 10b-5.

---

The deadline to accept or reject the Plan is *9:00 p.m. (prevailing Pacific time) on November 10, 2011* (the "Voting Deadline"), unless the Company, in its sole discretion, and from time to time, extends the Voting Deadline. To be counted, the ballots (each a "Ballot" and collectively, the "Ballots") indicating acceptance or rejection of the Plan must be received by Landis Rath & Cobb LLP, the Company's voting agent ("LRC" or the "Voting Agent"), no later than the Voting Deadline. In the interests of expedience, Ballots submitted electronically or by facsimile to the Voting Agent will be accepted by the Company.

---

The Company cannot assure you that the Disclosure Statement, including any exhibits to the Disclosure Statement, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases (a) will contain any of the terms described in this Disclosure Statement or (b) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. Therefore, making investment decisions based upon the information contained in this Disclosure Statement, the Plan, and the exhibits, is *highly speculative*. The Company urges each holder of a Claim or Equity Interest (i) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under Article IX of this Disclosure Statement, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan" and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

---

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and holders of Equity Interests in, the Debtors (including, without limitation, those holders of Claims who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

---

Prepared By:

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
William E. Chipman, Jr. (No. 3818)
919 Market Street, Suite 1800
Wilmington, DE 19801

Telephone:     (302) 467-4400
Facsimile:      (302) 467-4450

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

# TABLE OF CONTENTS

Page

ARTICLE I INTRODUCTION ................................................................................................... 1
    A.      PURPOSE AND EFFECT OF THE PLAN ............................................................. 2
    B.      OVERVIEW OF CHAPTER 11 ............................................................................. 2
    C.      SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED
           CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ................................... 3
    D.      SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS ................. 3
    E.      THE CONFIRMATION HEARING ....................................................................... 4
    F.      FCC APPROVALS ............................................................................................. 5
    G.      EFFECTIVE DATE OF THE PLAN ..................................................................... 6
    H.      RULES OF INTERPRETATION ........................................................................... 6

ARTICLE II BACKGROUND ................................................................................................... 7
    A.      OVERVIEW OF THE COMPANY'S BUSINESS .................................................... 7
    B.      THE COMPANY'S CORPORATE AND CAPITAL STRUCTURE ........................... 10
    C.      INDUSTRY OVERVIEW ................................................................................... 11
    D.      REGULATION ................................................................................................. 11

ARTICLE III CHAPTER 11 CASES ........................................................................................ 14
    A.      EVENTS LEADING TO THE CHAPTER 11 CASES ........................................... 14
    B.      THE RESTRUCTURING SUPPORT AGREEMENT ............................................. 15
    C.      ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ..................................... 21

ARTICLE IV THE JOINT PLAN ............................................................................................. 23
    A.      ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS .............................. 23
    B.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................. 24
    C.      MEANS FOR IMPLEMENTATION OF THE PLAN .............................................. 27
    D.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 29
    E.      PROVISIONS GOVERNING DISTRIBUTIONS .................................................... 30
    F.      ALLOWANCE OF CLAIMS ............................................................................... 32
    G.      SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............... 33
    H.      CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE ............ 36
    I.      RETENTION OF JURISDICTION ....................................................................... 37
    J.      MISCELLANEOUS PROVISIONS ...................................................................... 39

ARTICLE V SOLICITATION AND VOTING PROCEDURES ......................................................... 41
    A.      THE SOLICITATION PACKAGE ...................................................................... 41
    B.      VOTING DEADLINE ....................................................................................... 42

C.      VOTING INSTRUCTIONS ........................................................................................ 42

D.      VOTING TABULATION ........................................................................................... 43

ARTICLE VI FINANCIAL PROJECTIONS ........................................................................................... 44

A.      FINANCIAL PROJECTIONS ................................................................................. 44

ARTICLE VII CONFIRMATION PROCEDURES ............................................................................. 46

A.      CONFIRMATION HEARING; APPROVAL OF SOLICITATION PROCEDURES .......... 46

B.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...................... 46

C.      RISK FACTORS .................................................................................................... 49

D.      IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION ...................... 49

E.      DISCLAIMER ....................................................................................................... 49

ARTICLE VIII IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF
       REORGANIZED DEBTORS .................................................................................. 50

A.      BOARD OF DIRECTORS AND MANAGEMENT ...................................................... 50

B.      EXIT FINANCING ................................................................................................ 50

ARTICLE IX PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING
       AND CONSUMMATING THE PLAN ...................................................................... 51

A.      GENERAL ............................................................................................................ 51

B.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS .............................................. 51

C.      FINANCIAL INFORMATION; DISCLAIMER ......................................................... 52

D.      FACTORS AFFECTING THE COMPANY ............................................................... 52

E.      SECURITIES TO BE ISSUED OR DISTRIBUTED UNDER THE PLAN ...................... 55

F.      CERTAIN TAX MATTERS .................................................................................... 56

G.      FCC APPROVALS ................................................................................................ 56

H.      RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY
       BE INACCURATE ................................................................................................ 56

I.      LIQUIDATION UNDER CHAPTER 7 ..................................................................... 56

ARTICLE X SECURITIES LAW MATTERS ........................................................................................ 57

A.      PLAN SECURITIES ............................................................................................. 57

B.      ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN ...................... 57

ARTICLE XI CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ................................... 58

A.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO
       THE COMPANY AND REORGANIZED AR HOLDINGS ......................................... 59

B.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO
       THE HOLDERS OF PREPETITION CREDIT FACILITY CLAIMS ............................ 61

ARTICLE XII CONCLUSION AND RECOMMENDATION .............................................................. 69

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | Debtors' Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code |
| **Exhibit B** | Restructuring Support Agreement |
| **Exhibit C** | Debtors' Financial Projections |
| **Exhibit D** | Liquidation Analysis |
| **Exhibit E** | Indemnification Agreement |

# ARTICLE I
## INTRODUCTION[3]

The Company is sending you this Disclosure Statement[4] because the Company is asking you to vote on approval of the Plan. A copy of the Plan is attached hereto as **Exhibit A**.[5] This Disclosure Statement describes certain aspects of the Plan, including the treatment of holders of Claims and Equity Interests, and also describes certain aspects of the Company's operations, financial projections, and other related matters.

**The statements and financial information contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified. Holders of Prepetition Credit Facility Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the date set forth on the cover page of this Disclosure Statement. Holders of Prepetition Credit Facility Claims entitled to vote to accept the Plan must rely on their own evaluation of the Company and their own analysis of the terms of the Plan, including, but not limited to, any risk factors cited herein, in deciding whether to vote to accept or reject the Plan.**

**The contents of this Disclosure Statement may not be deemed as providing any legal, financial, securities, tax, or business advice. The Company urges each holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby. Furthermore, the Bankruptcy Court's potential approval of the adequacy of disclosure contained in this Disclosure Statement will not constitute the Bankruptcy Court's approval of the merits of the Plan.**

**Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. Rather, holders of Claims and Equity Interests should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions.**

**Holders of Claims and Equity Interests are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan and the matters described under Article IX of this Disclosure Statement entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan" prior to deciding whether to accept or reject the Plan.**

**The Company has not authorized any party to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Company has not authorized any representations concerning the Company or the value of its property other than as set forth in this Disclosure Statement. Claimants should not rely upon any information, representations, or other inducements made to obtain acceptance of the Plan that are other than, or inconsistent with, the information contained herein and in the Plan.**

**The Company's management has reviewed the financial information provided in this Disclosure Statement. Although the Company has used its best efforts to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited.**

**The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information**

---

[3]  This introduction is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in the Disclosure Statement.

[4]  Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

[5]  As set forth in this Disclosure Statement, all Holders of Prepetition Credit Facility Claims who are entitled to vote on the Plan will receive this Disclosure Statement. All other Holders of Claims and Interests will receive a notice of the Disclosure Statement, which will provide details on how to obtain copies of this Disclosure Statement.

contained herein. Persons or entities trading in or otherwise purchasing, selling or transferring securities or claims should evaluate this Disclosure Statement and the Plan in light of the purpose for which they were prepared.

The Company recommends that potential recipients of New Holdings Equity, including warrants to purchase New Holdings Equity, consult their own counsel concerning the Federal Communication Commission and securities laws consequences concerning the transferability of the New Holdings Equity.

This Disclosure Statement summarizes certain provisions of the Plan, certain other documents, and certain financial information. The Company believes that these summaries are fair and accurate; however, you should read the Plan in its entirety. In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Plan or the other documents or financial information to be incorporated herein by reference, the Plan, or such other documents, as applicable, shall govern for all purposes.

The Company is providing the information in this Disclosure Statement solely for purposes of soliciting the votes of Holders of Prepetition Credit Facility entitled to vote to accept or reject the Plan or object to confirmation of the Plan ("Confirmation"). Nothing in this Disclosure Statement may be used by any person for any other purpose.

All exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.

RECOMMENDATION BY THE COMPANY:

The Boards of Directors of AR Holdings, StickCo and StickCo Licensing have approved the Solicitation, the Plan, and the transactions contemplated thereby and recommend that all holders of claims whose votes are being solicited submit Ballots to accept the Plan.

A.    PURPOSE AND EFFECT OF THE PLAN

The primary purpose of the Plan is to effectuate the restructuring of the Company's capital structure. Presently, the funds expected to be generated by the Company's operation of its business and other sources will not be sufficient to meet the Company's secured debt service requirements and satisfy its secured debt obligations unless the restructuring is consummated.

In connection with developing the Plan, the Company conducted a careful review of its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries of holders of Allowed Claims and Equity Interests in various liquidation scenarios. As a result, the Company concluded that the recovery for holders of Allowed Claims and Equity Interests would be maximized by continuing to operate as a going concern. The Company believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein and other analyses prepared by the Company and its advisors, the value of the Company's assets would be greater if the Company operates as a going concern instead of liquidating. Moreover, the Company believes that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation, or attempts by another party in interest to file a plan of reorganization, would result in delays, litigation, and additional costs, and ultimately would lower the recoveries for holders of Allowed Claims and Equity Interests. Accordingly, the Company strongly recommends that you vote to accept the Plan, if you are entitled to vote.

B.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date (the "Petition Date"). The Bankruptcy Code

provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy.

**C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a Chapter 11 plan. For example, holders of Claims and Equity Interests not impaired by the Plan are deemed to accept the Plan under Section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Equity Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following chart summarizes distributions to holders of Allowed Claims and Equity Interests under the Plan.[6] The recoveries set forth below are projected recoveries and may change based upon changes in Allowed Claims and Equity Interests and proceeds available.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Recovery of Allowed Claims and Equity Interests | Voting Rights |
|-------|----------------------|-----------------------------------|----------------------------------------------------------|---------------|
| 1 | Other Priority Claims | Unimpaired | 100% | Deemed to accept |
| 2 | Prepetition Credit Facility Claims | Impaired | Unknown[7] | Entitled to vote |
| 3 | Other Secured Claims | Unimpaired | 100% | Deemed to accept |
| 4 | General Unsecured Claims | Unimpaired | 100% | Deemed to accept |
| 5 | Intercompany Claims | Unimpaired | 100% | Deemed to accept |
| 6 | Holdings Equity Interests | Impaired | 0.0% | Deemed to reject |
| 7 | StickCo Equity Interests | Unimpaired | 100% | Deemed to accept |

For a detailed description of the Classes of Claims and Equity Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

**D.    SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS**

The following materials constitute the solicitation package (the "**Solicitation Package**"):

- the appropriate Ballot and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

---

[6]  This chart is only a summary of the classification and treatment of Allowed Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Interests.

[7]  The securities being distributed under the Plan have not been valued.

- the Disclosure Statement with all exhibits, including the Plan.

Only the holders of Allowed Class 2 (Prepetition Credit Facility Claims) are entitled to vote to accept or reject the Plan and will be served either paper copies or a CD-ROM containing the Disclosure Statement with all exhibits, including the Plan. Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Voting Agent by writing to StickCo Plan Voting, c/o Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087, Wilmington, DE 19801, Attn: William E. Chipman, Jr., or calling (302) 467-4435. All parties entitled to vote to accept or reject the Plan will receive a paper copy of each appropriate Ballot.

LRC, the Company's bankruptcy counsel, has also agreed to serve as the Voting Agent to assist in the balloting and tabulation process. LRC will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the holders of Class 2 - Prepetition Credit Facility Claims are entitled to vote to accept or reject the Plan. To be counted, Ballots cast by holders must be received by Voting Agent by 9:00 p.m. (prevailing Pacific time) on November 10, 2011, the Voting Deadline. Voting instructions are attached to each ballot. (Please see Article V below, entitled **"Solicitation and Voting Procedures"** for additional information.) In the interests of expedience, Ballots submitted electronically or by facsimile to the Voting Agent will be accepted by the Company. Unless the Company, in its discretion decides otherwise, any Ballot received after the Voting Deadline will not be counted. LRC will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file a voting report (the **"Voting Report"**) as soon as practicable on or after the Petition Date.

For answers to any questions regarding solicitation procedures applicable to their Claims and Equity Interests, parties may contact LRC directly, at (302) 467-4435.

A plan supplement containing additional documents referenced in the Plan (as defined in the Plan, the **"Plan Supplement"**) may be filed by the Debtors no later than 10 days (the **"Plan Supplement Filing Date"**) before the date of the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code (**"Confirmation Hearing"**). When filed, the Plan Supplement will be available in both electronic and hard copy form, although the Company will not serve paper or CD-ROM copies. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest at the commencement of the case.

**Any Ballot that is properly executed by the holder of a Claim but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, will not be counted.**

**Each holder of a Class 2 Prepetition Credit Facility Claim must vote all of their Class 2 Claims within a particular Plan Class either to accept or reject the Plan and may not split their votes. By signing and returning a Ballot, each holder of a Class 2 Claim certifies to the Bankruptcy Court and the Company that no other Ballots with respect to such Class 2 Claim have been cast or, if any other Ballots have been cast with respect to such Class 2 Claim, such other Ballots are revoked.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot.**

**The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions as well as, to the extent applicable, section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.**

## E. THE CONFIRMATION HEARING

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing, and that any party in interest may object to Confirmation of the Plan.

On or about the Petition Date, the Company will seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure

Statement, and Confirmation of the Plan. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## F.    FCC APPROVALS

The transfer of the Company's broadcasting licenses, upon both the entry into Chapter 11 and the emergence from Chapter 11 require consent of the Federal Communications Commission (the "FCC"). Under the Communications Act of 1934, as amended ("Communications Act"), the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments and transfers of control, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated. The FCC treats emergence from bankruptcy by a licensee or its parent company as a "voluntary" transfer of control or assignment of FCC licenses when control will be transferred to a "permanent" holder, rather than to some other court-appointed interim holder. The restructuring will not be implemented until the FCC has granted applications seeking approval of the new control structure.

Following the filing of its voluntary petitions under chapter 11, the Company will file applications seeking the FCC's consent to the pro forma assignment of its FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under Chapter 11 (the "FCC Short-Form Transfer Application"). The Debtors will also be required to file applications with the FCC (the "FCC Long-Form Transfer Application") to obtain approval of the transfer of control of the Company. The FCC Short-Form Transfer Application can be approved by the FCC on a more expedited basis than the FCC Long-Form Transfer Application and is not subject to formal petitions to deny. In processing applications for consent to the transfer of control of FCC broadcast licensees, the FCC considers, among other things, whether those considered to be "parties" to the application possess the legal, character and other qualifications to hold an interest in a broadcast station. The FCC also considers compliance with limitations on multiple and foreign ownership, other legal qualifications, the parties' prior records before the FCC and certain categories of prior adverse determinations against parties to the application by courts and other administrative bodies that the FCC believes are relevant to assessing the qualifications of parties that will hold attributable interests in a broadcast licensee.

The FCC will allow the application for transfer out of bankruptcy to a "permanent" holder to be filed once the plan of reorganization has been filed with the bankruptcy court, but the FCC will not grant the application until the application has been amended to show that the bankruptcy court has approved the plan of reorganization and authorized the transaction. Generally, three to seven days after submission of the applications for a voluntary transfer of control, the FCC issues public notice that it has accepted the applications for filing. Interested parties then have 30 days to file petitions to deny the applications. To the extent petitions to deny are filed in this situation, they typically focus on the qualifications of the restructured debtor and its reportable owners, officers and directors to hold or control FCC broadcast licenses. If petitions to deny are filed against the transfer applications, the applicants will have an opportunity to file an opposition, with the petitioner then having an opportunity to file a reply. The FCC then will consider the applications and the filings made by the parties to the proceeding. Oppositions to the application for FCC consent to transfer FCC licenses can delay the process.

If no oppositions are filed against the applications and the FCC finds the applications to be in compliance with its rules and policies, the FCC may grant the applications shortly after the close of the public notice period. In some instances, the FCC may request that the applicants supply additional information through amendments to the applications. There is no time limit on how long the FCC may consider transfer applications before acting on them, but the FCC has a stated goal of processing all transfer applications within 180 days, and many applications are granted more quickly. The FCC will not grant the applications, however, until the Bankruptcy Court has approved a plan of reorganization and the applications reflect that the Bankruptcy Court has authorized the transaction.

Once the FCC has granted a transfer application, it will issue a public notice of the grant. Interested parties opposed to the grant may file for reconsideration for a period of 30 days following public notice of the grant. If the grant is made by the FCC's staff under delegated authority, the FCC may reconsider the action on its own motion for a period of 40 days following issuance of public notice of the grant. Parties are free to close upon the grant of FCC consent even if petitions for reconsideration are filed, but the consummation will be subject to any further order that

the FCC might issue upon reconsideration. Although unusual, the FCC may rescind a grant of consent upon reconsideration if it finds that doing so would serve the public interest, convenience and necessity.

*FCC Trust Option.* The Debtors, Media Parent (as defined in the Plan), and Required Consenting Lenders (as defined in the Plan) may determine that establishing a trust into which securities issued under the Plan may be transferred (the "**FCC Trust**") would be desirable to effect the restructuring set forth in the Plan (including, for example, if they believe that the FCC's review of the FCC Long-Form Transfer Application may delay consummation of the Plan). The Plan sets forth that the FCC Trust may be established, and, if established and following receipt of all necessary FCC approvals, the FCC Trust would hold securities to be distributed under the Plan for the benefit of the Prepetition Lenders. The FCC Trust would be administered pursuant to a trust agreement (the "**FCC Trust Agreement**") that would contain provisions customary to trust agreements utilized in similar circumstances. Any such FCC Trust Agreement would be filed with the Bankruptcy Court as part of the Plan Supplement (as defined in the Plan) or an amendment to the Plan Supplement. *See* Article XI.D for a discussion of tax consequences to holders of Prepetition Credit Facility Claims related to any such FCC Trust.

## G.    EFFECTIVE DATE OF THE PLAN

Certain requirements and conditions set forth in Article IX of the Plan must be satisfied before the Plan becomes effective and binding. *See* Article IV. H. for a description of those requirements and conditions.

## H.    RULES OF INTERPRETATION

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.B. of the Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (3) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (5) any reference to an Entity as a holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement or to this Disclosure Statement; (7) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (8) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (10) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in Bankruptcy Code § 102 shall apply; (11) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to statutes, regulations, orders, rules of courts, and similar authority shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

# ARTICLE II
# BACKGROUND

## A.    OVERVIEW OF THE COMPANY'S BUSINESS

### 1.    The Company

The Company currently operates four radio stations: (i) KHJK-FM (formerly KIOL-FM) and KFNC-FM in Houston, TX, and (ii) KMJK-FM and KCHZ-FM in Kansas City, MO-KS (collectively, the **"Radio Stations"** and individually, each a **"Radio Station"**).  Cumulus Media Partners, LLC, a Delaware limited liability company (**"Media Parent"**) owns 100% of the equity interests of AR Holdings.

### 2.    Radio Station Overview

| Call Sign | Frequency | Station Brand | Format | Website |
|-----------|-----------|---------------|--------|---------|
| KHJK- FM | 103.7 | Houston's 103.7 | Adult Alternative | www.1037online.com |
| KFNC-FM | 97.5 | 97.5 The Ticket | Sports/Talk | www.975theticket.com |
| KMJK-FM | 107.3 | Magic 107.3 | Urban AC | www.magic1073.com |
| KCHZ-FM | 95.7 | 95.7 The Vibe | Contemporary Hits | www.957thevibe.com |

### 3.    The Houston Stations

Houston-Galveston is the sixth (6th) largest Arbitron rated market in the country.  The Houston-Galveston market has a population of approximately 5.8 million people.

### (i)    KHJK-FM

KHJK is licensed to broadcast at 103.7 Megahertz ("MHz") from La Porte, Texas with 100 kilowatts ("kW") of effective radiated power ("ERP") from an antenna Height Above Average Terrain ("HAAT") of 1,936 feet.  The station programs an Adult Hits format.

This station recently exhibited a 9 rating share Persons 25-54 (Fall, 2010) in the market.  The station generated $1.3 million of net revenues and $(0.3) million of station operating income for 2010.  In 2011, the station is projected to generate net revenues and station operating income of $0.9 million and ($0.2) million, respectively.

### (ii)    KFNC-FM

KFNC is currently programmed as a Sports/Talk station (ESPN).  KFNC is a Class C station licensed to Beaumont, Texas.  The station is licensed to broadcast at 97.5 MHz with 100.0 kW of ERP from an antenna HAAT of 1,955 feet.  KFNC began airing a News /Talk format in late May of 2005.  KFNC's programming has changed several times over the years, varying from Urban to Urban AC until April of 2005, when the station began simulcasting Rock programming (now on KIOL), until a News / Talk format began airing in late May 2005.  The station adopted its current format of Sports/Talk in January 2007.

This station recently exhibited a 7 rating share Persons 25-54 (Fall, 2010) in the market.  The station generated $1.9 million of net revenues and $0.08 million of station operating income for 2010.  In 2011, the station is projected to generate net revenues and station operating income of $2.1 million and ($0.1) million, respectively.

### 4.    The Kansas City Stations

Kansas City is the thirty-second (32nd) largest Arbitron rated market in the country.  The Kansas City market has a population of approximately 1.9 million people.

### (i) **KMJK-FM**

KMJK was purchased together with KCHZ in December 2003. KMJK is programmed in the Urban Adult Contemporary format. The station is Class C1 station licensed to broadcast at 107.3 megahertz with 100.0 kW of ERP from an antenna HAAT of 981 feet.

This station recently exhibited a 3.7 rating share Persons 25-54 (Fall, 2010) in the market. The station generated $1.8 million of net revenues and $0.4 million of station operating income for 2010. In 2011, the station is projected to generate net revenues and station operating income of $1.5 million and $0.2 million, respectively.

### (i) **KCHZ-FM**

KCHZ is programmed in a Rhythmic/CHR format. The station is Class C1 station licensed to broadcast at 95.7 megahertz with 98.0 kW of ERP from an antenna HAAT of 981 feet.

This station recently exhibited an 8.7 rating share Persons 18-34 (Fall, 2010) in the market. The station generated $2.0 million of net revenues and $0.7million of station operating income for 2010. In 2011, the station is projected to generate net revenues and station operating income of $2.6 million and $1.4 million, respectively.

### 5. Advertising Sales

Virtually all of the Company's revenue is generated from the sale of local, regional and national advertising for broadcast on its radio stations. In 2010, 2009 and 2008, approximately 84.5%, 89.5% and 89.5%, respectively, of the Company's net broadcasting revenue was generated from the sale of local and regional advertising. Additional broadcasting revenue is generated from the sale of national advertising. The major categories of the Company's advertisers include: (i) amusement and recreation; (ii) banking and mortgage; (iii) furniture and home furnishings; (iv) arts and entertainment; (v) food and beverage services; (vi) healthcare services; (vii) automotive dealers; (viii) food and beverage stores; and (ix) telecommunications.

Each Radio Station's local sales staff solicits advertising either directly from local advertisers or indirectly through an advertising agency. The Company also employs personnel in each of its markets to produce custom commercials for its advertisers.

The Company's national sales are made by Katz Communications, Inc., a firm specializing in radio advertising sales on the national level, in exchange for commission that is based on net revenue from the advertising obtained. The Company's regional sales, which it defines as sales in regions surrounding its markets to buyers that advertise in a particular market, are generally made by the Company's local sales staff and market managers.

The Radio Stations strive to maximize revenue by managing their on-air inventory of advertising time and adjusting prices up or down based on supply and demand. The number of advertisements that can be broadcast without jeopardizing listening levels and the resulting ratings are limited in part by the format of a particular station. Each of the Radio Stations has a general target level of on-air inventory available for advertising. This target level of inventory for sale may vary at different times of the day but tends to remain stable over time.

Advertising rates charged by radio stations, which are generally highest during morning and afternoon commuting hours, are based primarily on:

- a station's share of audiences and on the demographic groups targeted by advertisers (as measured by ratings surveys);

- the supply and demand for radio advertising time and for time targeted at particular demographic groups; and

- certain additional qualitative factors.

A station's listenership is reflected in ratings surveys that estimate the number of listeners tuned into the station, and the time they spend listening. Each station's ratings are used by its advertisers and advertising representatives to consider advertising with the station and are used to chart audience growth, set advertising rates

and adjust programming. Currently, the Company utilizes Arbitron's ratings services to provide rating information with regard to the Radio Stations.

The Company's selling and pricing activity is based on demand for its Radio Stations' on-air inventory and, in general, the Company responds to this demand by varying prices rather than by varying its target inventory level for a particular station. Most changes in revenue are explained by some combination of demand-driven pricing changes and changes in inventory utilization rather than by changes in the available inventory.

### 6. Employees

At December 31, 2010, the Company employed approximately 61 people. None of the Company's employees are covered by collective bargaining agreements. On occasion, the Company enters into employment agreements with on-air personalities.

### 7. Competition

The radio broadcasting industry is very competitive. The success of each of the Radio Stations depends largely upon its audience ratings and its share of the overall advertising revenue within their particular markets. The Company's audience ratings and advertising revenue are subject to change, and any adverse change in a particular market affecting advertising expenditures or any adverse change in the relative market share of the stations located in a particular market could have a material adverse effect on the revenue of the stations located in that market.

The Radio Stations compete for listeners and advertising revenues directly with other radio stations within their respective markets, as well as with other advertising media as discussed below. Additionally, new online music services have begun selling advertising locally, creating additional competition for both listeners and advertisers. Radio stations compete for listeners primarily on the basis of program content that appeals to a particular demographic group. Companies that operate radio stations must be alert to the possibility of another station changing its format to compete directly for listeners and advertisers. Another station's decision to convert to a format similar to that of one of the Radio Stations in the same geographic area or to launch an aggressive promotional campaign may result in lower ratings and advertising revenue, increased promotion and other expenses and, consequently, lower the Company's operating income.

Factors that are material to a radio station's competitive position include station brand identity and loyalty, management experience, the station's local audience rank in its market, transmitter power and location, assigned frequency, audience characteristics, local program acceptance and the number and characteristics of other radio stations and other advertising media in the market area.

The Company's stations also compete for advertising revenue with other media, including low power FM radio stations (that are required to operate on a noncommercial basis), newspapers, broadcast television, cable and satellite television, magazines, direct mail, coupons and outdoor advertising. In addition, the radio broadcasting industry is subject to competition from companies that use new media technologies that are being developed or have already been introduced, such as the Internet and the delivery of digital audio programming by cable television systems, by satellite radio carriers, and by terrestrial-based radio stations that broadcast digital audio signals. The FCC authorized two companies, who have since merged to provide a digital audio programming service by satellite to nationwide audiences with a multi-channel, multi-format and with sound quality equivalent to that of compact discs. The FCC has also authorized FM terrestrial stations like the Radio Stations to use two separate antennae to deliver both the current analog radio signal and a new digital signal. The FCC is also exploring the possibility of allowing AM stations to deliver both analog and digital signals.

The Company cannot predict how new sources of competition will affect its performance and income. Historically, the radio broadcasting industry has grown despite the introduction of new technologies for the delivery of entertainment and information, such as television broadcasting, cable television, audio tapes and compact discs. A growing population and greater availability of radios, particularly car and portable radios, have contributed to this growth. There can be no assurance, however, that the development or introduction of any new media technology will not have an adverse effect on the radio broadcasting industry in general or the Company's stations in particular.

Finally, the Company cannot predict what other matters might be considered in the future by the FCC or Congress, nor can it assess in advance what impact, if any, the implementation of any of these proposals or changes might have on the Company's business.

## B.    THE COMPANY'S CORPORATE AND CAPITAL STRUCTURE

### 1.    Summary of Prepetition Indebtedness and Other Financings as of the Petition Date

StickCo, as borrower, NexBank, SSB, as successor administrative agent and collateral agent to Deutsche Bank Trust Company Americas (in such capacity, the **"Prepetition Agent"**), certain lenders party thereto from time to time (collectively, the **"Prepetition Lenders"**), and certain other entities are party to the *Credit Agreement*, dated as of May 3, 2006 (as amended, modified, supplemented or otherwise in effect from time to time, the **"Prepetition Credit Agreement"**). In connection with the Prepetition Credit Agreement, the Prepetition Agent, StickCo and/or StickCo Licensing have also entered into the other "Loan Documents" (as that term is defined in the Prepetition Credit Agreement).

As of the date hereof, the loan amounts outstanding under the Prepetition Credit Agreement include: (i) term loans in an aggregate principal amount of $69,228,000, plus accrued and unpaid interest and fees thereon (collectively, the **"Prior Term Loans"**), and (ii) revolving loans in an aggregate principal amount of $17,000,000, plus accrued and unpaid interest and fees thereon (collectively, the **"Prior Revolving Loans"** and, together with the Prior Term Loans and all other obligations under the Prepetition Credit Agreement including certain fees and expenses, the **"Prior Loans"**). On January 21, 2010, the Prepetition Agent declared, pursuant to Section 8.02(b) of the Prepetition Credit Agreement, that the unpaid principal amount of all outstanding loans under the Prepetition Credit Agreement and all accrued and unpaid interest thereon, and all other amounts due and owing under the Prepetition Credit Agreement, immediately due and payable, without presentment, demand, or other notice to StickCo. Beginning on December 31, 2009, StickCo has not made scheduled loan and interest payments under the Prepetition Credit Agreement. As of June 30, 2011, the collective amount outstanding under the Prior Term Loans and Prior Revolving Loans was $97,417,658.72.

The Prior Loans are secured by first-priority liens and security interests in substantially all of the personal and real property of StickCo and StickCo Licensing (the **"Prepetition Collateral"**) described in the Security Agreement, dated as of May 3, 2006 (as amended, supplemented, modified or otherwise in effect from time to time) and the other "Collateral Documents" (as that term is defined in the Prepetition Credit Agreement).

### 2.    Common Equity

As set forth in the organization chart below, one hundred (100%) percent of the outstanding equity of StickCo Licensing is presently owned by StickCo. AR Holdings is the sole equityholder of StickCo. Media Parent is a nondebtor and the sole stockholder of AR Holdings.



```
┌─────────────────────────────────┐
│   Cumulus Media Partners, LLC   │
│         (Media Parent)          │
└─────────────────────────────────┘
                 │
┌─────────────────────────────────┐
│  AR Broadcasting Holdings, Inc.  │
│         (AR Holdings)           │
│            (Debtor)             │
└─────────────────────────────────┘
                 │
┌─────────────────────────────────┐
│       AR Broadcasting, LLC       │
│           (StickCo)             │
│            (Debtor)             │
└─────────────────────────────────┘
                 │
┌─────────────────────────────────┐
│        AR Licensing, LLC         │
│       (StickCo Licensing)       │
│            (Debtor)             │
└─────────────────────────────────┘
```

## C.     INDUSTRY OVERVIEW

The primary source of revenue for radio stations is the sale of advertising time to local, regional and national advertisers.

Radio stations are typically classified by their on-air format, such as country, rock, adult contemporary, oldies, and news/talk. A station's format and style of presentation enables it to target specific segments of listeners sharing certain demographic features. By capturing a specific share of a market's radio listening audience with particular concentration in a targeted demographic, a station is able to market its broadcasting time to advertisers seeking to reach a specific audience. Advertisers and stations use data published by audience measuring services, such as Arbitron, to estimate how many people within particular geographical markets and demographics listen to specific stations.

The number of advertisements that can be broadcast without jeopardizing listening levels and the resulting ratings are limited in part by the format of a particular station and the local competitive environment. Although the number of advertisements broadcast during a given time period may vary, the total number of advertisements broadcast on a particular station generally does not vary significantly from year to year.

A station's local sales staff generates the majority of its local and regional advertising sales through direct solicitations of local advertising agencies and businesses. To generate national advertising sales, a station usually will engage a firm that specializes in soliciting radio-advertising sales on a national level. National sales representatives obtain advertising principally from advertising agencies located outside the station's market and receive commissions based on the revenue from the advertising they obtain.

## D.     REGULATION

The ownership, operation and sale of radio broadcast stations, including those licensed to the Company, are subject to the jurisdiction of the FCC, which acts under authority derived from the Communications Act. Among its other regulatory responsibilities, the FCC issues permits and licenses to construct and operate radio stations; assigns broadcast frequencies; determines whether to approve changes in ownership or control of station licenses; regulates

transmission equipment, operating power, and other technical parameters of stations; adopts and implements regulations and policies that directly or indirectly affect the ownership, operation and employment practices of stations; regulates the content of some forms of radio broadcast programming; and has the authority under the Communications Act to impose penalties for violations of its rules.

The following is a brief summary of certain provisions of the Communications Act and related FCC rules and policies (collectively, the "**Communications Laws**"). This description does not purport to be comprehensive, and reference should be made to the Communications Laws, public notices, and decisions issued by the FCC for further information concerning the nature and extent of federal regulation of radio broadcast stations. Failure to observe the provisions of the Communications Laws can result in the imposition of various sanctions, including monetary forfeitures and the grant of a "short-term" (less than the maximum term) license renewal. For particularly egregious violations, the FCC may deny a station's license renewal application, revoke a station's license, or deny applications in which an applicant seeks to acquire additional broadcast properties.

License Grant and Renewal. Radio broadcast licenses are generally granted and renewed for maximum terms of eight years. Licenses are renewed by filing an application with the FCC. Petitions to deny license renewal applications may be filed by interested parties, including members of the public.

Service Areas. The area served by an FM station is determined by a combination of transmitter power and antenna height, with stations divided into classes according to these technical parameters. There are eight classes of FM radio stations, with each class having the right to broadcast with a certain amount of power from an antenna located at a certain height. The most powerful FM radio stations are Class C FM stations, which operate with the equivalent of 100 kW of ERP at an antenna HAAT of up to 1,968 feet and which usually provide service to a large area, typically covering one or more counties within a state. There are also Class C0, C1, C2 and C3 FM radio stations which operate with progressively less power and/or antenna height. Class B FM stations operate with the equivalent of 50 kW ERP at an antenna HAAT of up to 492 feet. Class B stations typically serve large metropolitan areas as well as their associated suburbs. There are also Class B1 stations that can operate with 25 kW ERP at an antenna HAAT of up to 328 feet. Class A FM stations operate with the equivalent of 6 kW ERP at an antenna HAAT of up to 328 feet, and generally serve smaller cities and towns or suburbs of larger cities.

Regulatory Approvals. The Communications Laws prohibit the assignment or transfer of control of a broadcast license without the prior approval of the FCC. In determining whether to grant an application for assignment or transfer of control of a broadcast license, the Communications Act requires the FCC to find that the assignment or transfer would serve the public interest. The FCC considers a number of factors in making this determination, including (1) compliance with various rules limiting common ownership of media properties, (2) the financial and "character" qualifications of the assignee or transferee (including those parties holding an "attributable" interest in the assignee or transferee), (3) compliance with the Communications Act's foreign ownership restrictions, and (4) compliance with other Communications Laws, including those related to programming and filing requirements.

Foreign Ownership Restrictions. Section 310(b) of the Communications Act restricts foreign ownership or control of any entity licensed to provide broadcast and certain other services. Among other prohibitions, foreign entities may not have direct or indirect ownership or voting rights of more than 25% in a corporation controlling the licensee of a radio broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to foreign ownership or voting rights. The FCC has generally interpreted this provision to mean that it must make an affirmative public interest finding before a broadcast license may be granted or transferred to a corporation which is controlled by another corporation more than 25% owned or controlled, directly or indirectly, by foreigners. With very few exceptions, the FCC historically has not made such an affirmative finding in the broadcast field. The FCC calculates the voting rights separately from equity ownership, and both thresholds must be met. Warrants and other future interests typically are not taken into account in determining foreign ownership compliance. In some specific circumstances, however, the FCC has treated non-stock interests in a corporation as the equivalent of equity ownership and has assessed foreign ownership based on contributions to capital. Companies that own broadcast stations are required to take appropriate steps to monitor the citizenship of their stockholders, such as through representative samplings on a periodic basis, to provide a reasonable basis for certifying compliance with the foreign ownership restrictions of the Communications Act.

Other Ownership Matters. The Communications Laws also generally restrict (1) the number of radio stations one person or entity may own, operate or control in a local market, (2) the common ownership, operation or control of radio broadcast stations and television broadcast stations serving the same local market, and (3) except in the 20 largest designated market areas ("DMAs"), the common ownership, operation or control of a radio broadcast station and a daily newspaper serving the same local market.

On June 2, 2003, the FCC adopted new ownership rules and policies (the "2003 Rules"). Among other changes, the 2003 Rules would (1) retain the limit on the number of stations a licensee or attributable party could own in a radio market but instituted a change in the methodology used to determine the boundaries of radio markets, (2) require that joint sales agreements ("JSAs") involving radio stations (but not television stations) be deemed to be an attributable ownership interest under certain circumstances, (3) repeal the limitations on the radio-television and cross media ownership limits, and (4) relax, but not eliminate, the limitation on the number of stations that an attributable party could own in a single market. Certain private parties challenged the 2003 Rules in court, and a court order prevented the 2003 Rules from going into effect pending consideration of the challenges. On June 24, 2004, a court decision upheld some of the 2003 Rules (for the most part, those that relate to radio) and concluded that other 2003 Rules (for the most part, those that relate to television and newspapers) required further explanation or modification. The decision left in place, however, the order which precluded all of the 2003 Rules from going into effect and sent the 2003 Rules back to the FCC for further refinement.

On February 4, 2008, the FCC issued a Report and Order on Reconsideration which changed Commission rules to allow, among other things, common ownership of a radio station or a television station (under certain circumstances) and a daily newspaper in the top 20 DMAs. The FCC retained all other rules related to radio ownership without change. These rules have been challenged in court and remain pending. In the meantime, the FCC is conducting other proceedings to determine whether any further changes in the broadcast ownership rules are warranted.

Programming and Operation. The Communications Act requires broadcasters to serve the "public interest". To satisfy that obligation broadcasters are required by FCC rules and policies to present programming that is responsive to community problems, needs and interests and to maintain certain records demonstrating such responsiveness. Complaints from listeners concerning a station's programming may be filed at any time and will be considered by the FCC both at the time they are filed and in connection with a licensee's renewal application. FCC rules also require broadcasters to provide equal employment opportunities ("EEO") in the hiring of new personnel, to abide by certain procedures in advertising opportunities, to make information available on employment opportunities on their website (if they have one), and maintain certain records concerning their compliance with EEO rules. The FCC will entertain individual complaints concerning a broadcast licensee's failure to abide by the EEO rules but also conducts random audits on broadcast licensees' compliance with EEO rules.

On January 24, 2008, the FCC proposed the adoption of certain rules and other measures to enhance the ability of radio and television stations to provide programming responsive to the needs and interests of their respective communities. The measures proposed include the creation of community advisory boards, requiring a broadcaster to maintain a main studio in the community of license of each station it owns, and the establishment of processing guidelines in FCC rules to evaluate the nature and quantity of non-entertainment programming provided by the broadcaster. The public comment and reply comment cycle has concluded and these rule changes remain pending before the FCC.

Local Marketing Agreements. A number of radio stations have entered into local marketing agreements ("LMAs"). In a typical LMA, the licensee of a station makes available, for a fee, airtime on its station to a party that supplies programming to be broadcast during that airtime and collects revenues from advertising aired during such programming. LMAs are subject to compliance with antitrust laws and the Communications Laws, including the requirement that the licensee must maintain independent control over the station and, in particular, its personnel, programming, and finances. The FCC has held that such agreements do not violate the Communications Laws as long as the licensee of the station receiving programming from another station maintains ultimate responsibility for, and control over, station operations and otherwise ensures compliance with the Communications Laws.

A station that brokers more than 15% of the weekly programming hours on another station in its market will be considered to have an attributable ownership interest in the brokered station for purposes of the FCC's ownership rules. As a result, a radio station may not enter into an LMA that allows it to program more than 15% of

the weekly programming hours of another station in the same market that it could not own under the FCC's multiple ownership rules.

Joint Sales Agreements. From time to time, radio stations, enter into JSAs. A typical JSA authorizes one station to sell another station's advertising time and retain the revenue from the sale of that airtime. A JSA typically includes a periodic payment to the station whose airtime is being sold (which may include a share of the revenue being collected from the sale of airtime). Like LMAs, JSAs are subject to compliance with antitrust laws and the Communications Laws, including the requirement that the licensee must maintain independent control over the station and, in particular, its personnel, programming, and finances. The FCC has held that such agreements do not violate the Communications Laws as long as the licensee of the station whose time is being sold by another station maintains ultimate responsibility for, and control over, station operations and otherwise ensures compliance with the Communications Laws.

A radio station that sells more than 15% of the weekly advertising time of another radio station in the same market will be attributed with the ownership of that other station. In that situation, a radio station cannot have a JSA with another radio station in the same market if the FCC's ownership rules would otherwise prohibit that common ownership.

Antitrust and Market Concentration Considerations. Acquisitions of radio stations, to the extent they meet specified size thresholds, will be subject to applicable waiting periods and possible review under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), by the Department of Justice or the Federal Trade Commission, either of whom can evaluate a transaction to determine whether that transaction should be challenged under the federal antitrust laws. Acquisitions that are not required to be reported under the HSR Act may still be investigated by the Department of Justice or the Federal Trade Commission under the antitrust laws before or after consummation. At any time before or after the consummation of a proposed acquisition, the Department of Justice or the Federal Trade Commission could take such action under the antitrust laws as it deems necessary, including seeking to enjoin the acquisition or seeking divestiture of the business acquired. The Department of Justice has reviewed numerous radio station acquisitions where an operator proposes to acquire additional stations in its existing markets or multiple stations in new markets, and has challenged a number of such transactions. Some of these challenges have resulted in consent decrees requiring the sale of certain stations, the termination of LMAs or other relief. In general, the Department of Justice has more closely scrutinized radio mergers and acquisitions resulting in local market shares in excess of 35% of local radio advertising revenues, depending on format, signal strength and other factors. There is no precise numerical rule, however, and certain transactions resulting in more than 35% revenue shares have not been challenged, while certain other transactions may be challenged based on other criteria such as audience shares in one or more demographic groups as well as the percentage of revenue share.

With the passage of the 1996 Telecommunications Act as its backdrop, the radio industry underwent a period of consolidation spurred by the merger and acquisition activity of the largest players in the industry throughout the late 90's. Radio operators employed a strategy of creating clusters of stations with shared resources in order to create economies of scale.

## ARTICLE III
## CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including the significant events leading to the Chapter 11 Cases and the anticipated events that will take place during the Chapter 11 Cases.

## A. EVENTS LEADING TO THE CHAPTER 11 CASES

### 1. The Economic Downturn

The recession that began in late 2008 and carried throughout 2009 hurt advertising-based businesses, including the Company. From 2007 to 2009, the radio industry saw three straight years of revenue decline, resulting in more than $6 billion or 25% of negative growth over that three year period.

## 2.   Impact of Hurricane Ike on the Company

For the Radio Stations located in Houston, Texas, recessionary pressures were compounded by the impact of Hurricane Ike in 2008. Hurricane Ike knocked down the towers of both stations which resulted in operating at partial power through the balance of the year and into early 2009 as the facilities were rebuilt. This had a direct impact on the ratings and revenue of these stations, and indirectly the Hurricane had a lasting impact on the Houston local economy that continues today.

## 3.   Need for Financial Restructuring

As the result of Hurricane Ike and continuing recessionary pressures, StickCo experienced significant revenue declines in late 2008 and throughout 2009. While there was a concerted effort on the part of management to mitigate the effect of these declines on profitability, by early 2009 it was highly unlikely that either company would be able to satisfy near term obligations under the Prepetition Credit Agreement.

In July 2009, conversations began with the Prepetition Lenders to come up with a long term solution which over the intervening time period evolved into the prepackaged bankruptcy proceeding contemplated in the Plan. The Company believes that the Plan is the best and most viable option to maximize the value of its assets for all parties-in-interest.

## B.   THE RESTRUCTURING SUPPORT AGREEMENT

From 2009 through 2011 the Company, together with its professional advisors, engaged in numerous and extensive negotiations with its Prepetition Lenders in an effort to reach a consensual agreement on restructuring the Company's balance sheet. These parties formulated the Restructuring Support Agreement embodying the terms upon which the Company's debts would be restructured.

On or about January 27, 2011, StickCo, StickCo Licensing, AR Holdings, Media Parent, the Prepetition Agent and certain of the Prepetition Lenders entered into that certain Restructuring Support Agreement (including the Restructuring Term Sheet attached thereto as Exhibit A (the **"Restructuring Term Sheet"**), a copy of which is attached hereto as **Exhibit B** and incorporated herein by reference (as amended on March 11, 2011 and June __, 2011, the **"Restructuring Support Agreement"**). The Restructuring Support Agreement and Restructuring Term Sheet set forth the terms upon which the Prepetition Lenders support the restructuring of StickCo's obligations under the Prepetition Credit Agreement (the **"Restructuring"**).

The Restructuring Support Agreement contemplates that, among other things:[8] (i) amounts due and owing under Prepetition Credit Agreement will be cancelled in exchange for the Lender Equity Interests (as described below) and New Term Loan Interests (as described below); (ii) trade credit and any other unsecured debt, and contracts, of StickCo and StickCo Licensing will be maintained without impairment; and (iii) all common stock of CMP Susquehanna Radio Holdings Corp., a Delaware corporation ("Radio Holdings") will be distributed to Media Parent[9].

---

[8]   The following summary of the terms of the Restructuring Support Agreement and Restructuring Term Sheet is provided solely for your benefit. To the extent there are any discrepancies between the summary and the Restructuring Support Agreement and Restructuring Term Sheet, the terms of the Restructuring Support Agreement and Restructuring Term Sheet shall govern.

[9]   At the time the applicable parties entered into the Restructuring Support Agreement, Radio Holdings was a direct subsidiary of contemplated debtor AR Holdings. As outlined in the Restructuring Support Agreement, the parties thereto -- including the Prepetition Agent and certain of the Prepetition Lenders -- agreed that all common stock of Radio Holdings would be distributed to Media Parent in the Company's bankruptcy cases, under the Plan. Based on developments that occurred after the parties entered into the Restructuring Support Agreement, AR Holdings and Media Parent identified and became able to implement -- with advance notice to, and no objection by, the Prepetition Agent -- an alternative method for distributing the common stock of Radio Holdings to Media Parent before the Company's Petition Date, thus eliminating the requirement for the distribution to occur under the Plan while still fulfilling the basic expectation under the Restructuring Support Agreement for the distribution to occur. Specifically, (a) Radio Holdings redeemed, effective September 16, 2011, all of its outstanding Series A Preferred Stock, par value $0.01 per share, pursuant to the rights under Radio Holdings' Amended and Restated Certificate of Incorporation; and (b) subject to approval by the FCC. AR Holdings intends to distribute, on or about October 31, 2011, all of the outstanding common stock of Radio Holdings to Media Parent.

1. **Lender Equity Interests**

The Lender Equity Interests to be issued to the Lenders and distributed among them *pro rata* in exchange for their interests in the Prior Loans are the following:

(i)     24% of the newly-issued shares of common stock ("**New Holdings Equity**") of AR Holdings, on or after the Effective Date ("**Reorganized AR Holdings**").

(ii)    Warrants to purchase 99% of the fully-diluted New Holdings Equity of Reorganized AR Holdings ("**New Holdings Warrants**").

The remaining New Holdings Equity – 76% of the outstanding New Holdings Equity as of the Effective Date – will be issued for consideration to Oxford Radio, LLC, an entity owned and controlled by Larry Patrick, or an affiliate thereof (the "**New Holdings Single Majority Stockholder**"). Separately, the New Holdings Single Majority Stockholder will receive aggregate annual compensation of $72,000 per year, plus reasonable expenses, to oversee the stations.

The principal terms and conditions of the New Holdings Equity and New Holdings Warrants include, without limitation:[10]

(i)     <u>Organizational Documents</u>: The organizational documents of Reorganized AR Holdings will be revised to incorporate corporate governance and other equity rights as more particularly described in the Restructuring Term Sheet.

(ii)    <u>No Stockholders Agreement</u>: Notwithstanding the Restructuring Term Sheet, the recipients of New Holdings Equity will not enter into a stockholders agreement on the Effective Date. Instead, the terms and conditions purported to be in the "Stockholders Agreement" (as that term is defined in the Restructuring Term Sheet) will be contained in the amended and restated certificate of incorporation of Reorganized AR Holdings.

(iii)   <u>Voting Rights</u>: The organizational documents of Reorganized AR Holdings will provide that each holder of issued and outstanding New Holdings Equity of Reorganized AR Holdings will be entitled to receive notice of and to attend, and the issued and outstanding New Holdings Equity will be entitled to vote at, all meetings of stockholders of Reorganized AR Holdings and will be entitled to one vote for each share of issued and outstanding New Holdings Equity held by such holder as of the record date for each such meeting, subject to the limitations hereinafter set forth for holders of the New Holdings Equity (other than the New Holdings Single Majority Stockholder). All holders of New Holdings Equity of Reorganized AR Holdings will vote together as a single class.

(iv)    <u>Corporate Governance</u>: On and after the Effective Date, the business and affairs of Reorganized AR Holdings will be managed by a board of directors appointed pursuant to the organizational documents of Reorganized AR Holdings, and subject to replacement by the New Holdings Single Majority Stockholder. The business and affairs of Reorganized AR Holdings will be subject to the Minority Stockholder Consent Rights (as discussed below).

(v)     <u>Transferability</u>: The organizational documents of Reorganized AR Holdings will provide that New Holdings Equity and New Holdings Warrants may only be transferred if transferred together, such that a corresponding amount of New Holdings Equity and New Holdings Warrants are transferred together in the same ratio to each other as held when the New Holdings Equity and New Holdings Warrants were initially distributed. Subject to that limitation, holders of New Holdings Equity and New Holdings Warrants will be permitted to freely transfer such New

---

[10] For a complete description of the terms and conditions of the New Holdings Equity and New Holdings Warrants, please see <u>Schedule B</u> to the Restructuring Term Sheet.

Holdings Equity and New Holdings Warrants (whether directly or by indirect transaction through a principal trading desk). However, no transfer that would cause a violation of FCC foreign ownership or attribution regulations will be permitted.

(vi) <u>Tag-Along Rights</u>: The holders of New Holdings Equity and New Holdings Warrants will have tag-along rights with respect to the proposed transfer by a holder (or holders, acting together in a group) of New Holdings Equity and New Holdings Warrants (subject to the Transferability restrictions set forth above), whether in one transaction or a series of related transactions, of at least 50% of the New Holdings Equity and New Holdings Warrants held by all holders of New Holdings Equity.

(vii) <u>Drag-Along Rights</u>: The organizational documents of Reorganized AR Holdings will provide that, subject to the Minority Stockholder Consent Rights, if holders of a majority of the issued and outstanding New Holdings Equity and New Holdings Warrants of Reorganized AR Holdings, on a fully diluted basis (such holders, collectively, the **"Sellers"**), at any time propose to transfer, in one or a series of related transactions, not less than a majority of the outstanding New Holdings Equity and New Holdings Warrants (subject to the Transferability restrictions set forth above) in a bona fide sale to an independent third party (a **"Drag-Along Sale"**), then the Sellers will be entitled to exercise a right (the **"Drag-Along Right"**) to require each of the other holders of New Holdings Equity and New Holdings Warrants to transfer their respective New Holdings Equity and New Holdings Warrants to the proposed transferee.

(viii) <u>Information Rights</u>: The organizational documents of Reorganized AR Holdings will provide that any entity that (i) as of the Effective Date is a holder of New Holdings Equity or New Holdings Warrants of Reorganized AR Holdings, or (ii) subsequent to the Effective Date becomes a holder of more than 1% of New Holdings Equity or New Holdings Warrants of Reorganized AR Holdings, will be entitled to receive, and Reorganized AR Holdings will provide to such holder, any and all information that the holders of New Term Loan Interests are entitled to receive.

(ix) <u>Preemptive Rights</u>: The organizational documents of Reorganized AR Holdings will provide for preemptive rights for each holder of New Holdings Equity or New Holdings Warrants.

(x) <u>Warrant Rights</u>: The New Holdings Warrants will be standard warrants without any special voting or other rights until exercised, except as set forth in the Restructuring Term Sheet.

(xi) <u>Exercise of Warrants</u>: The New Holdings Warrants will be convertible into the New Holdings Equity automatically upon a sale of Reorganized AR Holdings or upon the consent of the holders of a majority of the New Holdings Warrants, subject to any required prior FCC approval. Such conversion is further restricted to the extent that such exercise would place Reorganized AR Holdings in violation of the FCC's foreign ownership regulations or any other FCC rule, regulation or policy while it continues to hold a direct or indirect interest in any FCC license.

(xii) <u>Warrant Strike Price</u>: The New Holdings Warrants will have a nominal strike price. This will result in the New Holdings Warrants being treated as stock of Reorganized AR Holdings for federal income tax purposes.

(xiii) <u>Minority Stockholder Consent Rights</u>: Without the consent of the holders representing a majority of the New Holdings Equity not held by the New Holdings Single Majority Stockholder, Reorganized AR Holdings and its subsidiaries will not be permitted to take any of the actions set forth in Schedule B to the Restructuring Term Sheet

## 2. New Term Loan Interests

The principal terms and conditions of the New Term Loan Interests, will include, without limitation[11]:

(i)    <u>Borrower</u>:  StickCo.

(ii)    <u>Guarantors</u>:  StickCo Licensing and AR Holdings.

(iii)    <u>Amount</u>:  $20 million.

(iv)    <u>Administrative Agent and Collateral Agent</u>:  NexBank, SSB.

(v)    <u>Pricing</u>:  The Interest Rate for New Term Loan Interests will be LIBOR + 500 bps (the **"Interest Rate"**), except in certain cases when the Prepetition Lenders may convert the Interest Rate to the Base Rate[12] + 500 bps.  All accrued interest will be paid-in-kind and will be capitalized and added to the outstanding principal amount of the New Term Loan Interests.

(vi)    <u>Default Rate</u>:  Upon the occurrence and during the continuance of an event of default, at the option of the **"Required Lenders"** (Prepetition Lenders holding more than 51% of the principal amount of the New Term Loan Interests), the obligations will bear interest at a rate equal to 2% above the otherwise applicable Interest Rate.

(vii)    <u>Maturity Date</u>:  Unless accelerated by the Required Lenders as a result of an Event of Default, February 15, 2018.

(viii)    <u>Guaranty and Security</u>:  The New Term Loan Interests will be guaranteed by StickCo Licensing and AR Holdings, and will be secured by a first priority lien on, and security interest in, substantially all of the assets of AR Holdings, StickCo and StickCo Licensing in a manner that is consistent with FCC regulations (as applicable), including a pledge of the equity of StickCo and StickCo Licensing.

(ix)    <u>Expenses</u>:  StickCo will pay (a) all reasonable out-of-pocket costs and expenses (including attorneys' fees) of the Prepetition Agent associated with the New Term Loan Interests, including costs and expenses of preparing, negotiating, amending, waiving, and enforcing all documents executed in connection with the New Term Loan Interests, plus (b) all reasonable out-of-pocket costs and expenses of the Prepetition Lenders incurred in enforcing their rights and remedies.

## 3. Management Agreement

StickCo will enter into a management agreement (the **"Management Agreement"**) with Cumulus Broadcasting LLC or an affiliate thereof (the **"Manager"**), pursuant to which the Manager will provide for StickCo, subject to StickCo's ongoing authority and control (but only in a manner consistent with the FCC's regulations), certain "above the market" management functions and services relating to sales, programming, marketing, technical, website support, accounting, treasury, administrative, internal audit, legal, human resources, risk management and information technology, for a quarterly management fee, payable in advance, of $50,000 (prorated as appropriate) for the remaining quarters of 2011, and $62,500 thereafter.

---

[11]  For a complete description of the terms and conditions of the New Term Loan Interests, please see Schedule A to the Restructuring Term Sheet.

[12]  The "<u>Base Rate</u>" is for any day a fluctuating rate per annum equal to the higher of (a) the "Federal Funds Rate" (as defined below) plus ½ of 1% and (b) the rate from time to time published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates).  "Federal Funds Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the administrative agent.

The initial term of the Management Agreement will expire December 31, 2012, but thereafter will renew annually unless a notice of non-renewal is provided by either party no later than 120 days prior to the expiration of any term or renewal term; provided, that StickCo may terminate the Management Agreement without cost (i) on or after January 1, 2012 in connection with entering into a change of control transaction (including, without limitation, a merger, stock sale or sale of all or substantially all of the assets) or (ii) at any time in the event that the Manager or any of its employees takes certain actions that are considered materially adverse to StickCo's stations.

### 4. Facilities Use Agreement

StickCo will enter into an agreement with CMP Susquehanna Corp. or an affiliate thereof to memorialize the existing common expense, assets, and office space sharing arrangements (the **"Facilities Use Agreement"**). The term of this agreement will be the same as the term of the Management Agreement, and it will renew, expire and terminate on a co-terminus basis with the Management Agreement.

### 5. Indemnification Agreement

The Company, Prepetition Lenders, and Media Parent have entered into an indemnification agreement (attached hereto, the **"Indemnification Agreement"**), by which Media Parent will indemnify AR Holdings, StickCo, StickCo Licensing, the Prepetition Lenders, NexBank SSB and the holders of the Lender Equity Interests in respect of (i) liabilities to the extent arising prior to the closing of the Restructuring other than the Ordinary Course Liabilities and the Prior Loans, (ii) taxes of the StickCo Companies for any tax period ending on or before the closing of the Restructuring, (iii) taxes of CMP Susquehanna Radio Holdings Corp., (iv) liabilities arising as a result of effectuating the Restructuring through a bankruptcy filing, and (iv) liabilities and taxes arising out of the distribution of Radio Holdings. The Indemnification Agreement is not effective until the Required Consenting Lenders have fulfilled their voting commitments under section 2, clause (d)(i) of the Restructuring Support Agreement.

### 6. Prepackaged Bankruptcy Milestones

Subject to federal bankruptcy law and to any limitation resulting from honoring their respective fiduciary duties, each of AR Holdings, StickCo Licensing and StickCo (collectively, the **"StickCo Companies"**) and Media Parent agreed to use their best efforts to effectuate the Restructuring through the commencement of the Prepackaged Bankruptcy Proceeding and the Debtors also agreed to solicit acceptances thereof pursuant to the requirements of federal bankruptcy law, file the Prepackaged Bankruptcy Proceeding, as well as the Plan and Disclosure Statement on or before November 15, 2011 (in such context, the **"Petition Date"**), seek to obtain entry of an order of the Bankruptcy Court approving this Disclosure Statement and confirming the Plan, including all exhibits, appendices and related documents (each in form and substance reasonably acceptable to the StickCo Companies, Media Parent and the **"Required Consenting Lenders,"** as that term is defined in the Restructuring Support Agreement) (the **"Confirmation Order"**) within sixty (60) days after the Petition Date, and fulfill certain other conditions (collectively, the **"Prepackaged Bankruptcy Milestones"**).

### 7. Termination Events

Termination by Required Consenting Lenders. Upon the written election of the Required Consenting Lenders, the Restructuring Support Agreement may be terminated upon the occurrence (except as set forth below where notice and/or cure periods are provided) of any of the following events (each a **"Lender Termination Event"**):

(i) An agreement by the parties to the Restructuring Support Agreement to terminate the Restructuring Support Agreement;

(ii) An event occurs (including the granting of any relief by the Bankruptcy Court, but excluding the consummation of the Restructuring) that has, or is reasonably expected to have, a material adverse effect on (x) the business, assets or financial condition of the StickCo Companies or (y) the reasonable likelihood of the consummation of the Restructuring in accordance with the terms of Restructuring Support Agreement, and in the case of any such inconsistent relief granted by the Bankruptcy Court, such relief is not sought to be dismissed, vacated or modified to be consistent

with Restructuring Support Agreement and the Plan within five (5) Business Days after notice thereof has been given by the Required Consenting Lenders to StickCo or, if timely sought to be dismissed, vacated or modified, such relief is not granted with twenty-one (21) days after the filing of such request;

(iii)     The StickCo Companies, or any of them, or Media Parent, pursues, proposes or otherwise supports, or fails to actively oppose, any (x) restructuring of the Company's obligations, other than the Restructuring on the terms set forth in the Restructuring Term Sheet, or (y) amendment or modification to the Restructuring and/or the Plan, if applicable, containing any terms materially inconsistent with the Restructuring Term Sheet;

(iv)     A material breach by the StickCo Companies, or any of them, or Media Parent, of any of their obligations, undertakings, representations, warranties or covenants under the Restructuring Support Agreement and any such breach by the StickCo Companies or Media Parent, is not cured within two (2) Business Days after receipt by StickCo of written notice thereof from the Required Consenting Lenders;

(v)      The failure by the StickCo Companies to provide to the Prepetition Agent and its advisors reasonable access to their books and records and their management and advisors for the purposes of evaluating their business plans and participating in the process with respect to the consummation of the Restructuring and such failure is not cured within two (2) Business Days after receipt by StickCo of written notice thereof from the Required Consenting Lenders;

(vi)     On or after the date hereof, the StickCo Companies, or any of them, engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than the Restructuring or the commencement of the Prepackaged Bankruptcy Proceeding;

(vii)    The issuance by the Bankruptcy Court or any other Governmental Authority, and the becoming final and nonappealable, of any ruling or order (i) enjoining the consummation of a material portion of the Restructuring or (ii) otherwise finding the Restructuring Support Agreement to be invalid or unenforceable in material part;

(viii)   Any Prepackaged Bankruptcy Milestone is not satisfied on or before the date set forth in Section 3 of the Restructuring Support Agreement for such Prepackaged Bankruptcy Milestone;

(ix)     The StickCo Companies, or any of them, pursues the withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any other Plan Related Documents, notices, exhibits, appendices and orders, which withdrawal, amendment, modification or filing is inconsistent with the Restructuring Term Sheet in a manner not acceptable to the Required Consenting Lenders;

(x)      The Bankruptcy Court enters an order (1) dismissing the Prepackaged Bankruptcy Proceeding, (2) converting the Prepackaged Bankruptcy Proceeding to a case under chapter 7 of the Bankruptcy Code, (3) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in the Prepackaged Bankruptcy Proceeding; (4) terminating the StickCo Companies' exclusive periods to file and solicit votes to accept a plan of reorganization; (5) granting relief from the automatic stay with respect to any collateral subject to liens securing the Lender Claims; (6) terminating the right of the StickCo Companies to use cash collateral; or (7) making a finding of fraud, dishonesty or misconduct by any officer or director of the StickCo Companies;

(xi)     The filing of any involuntary bankruptcy against or other insolvency proceeding by the StickCo Companies, or any of them, other than the Prepackaged Bankruptcy Proceeding contemplated by this Agreement; or

(xii)   The StickCo Companies, or any of them, or Media Parent, pursues, proposes or otherwise supports, or fails to actively oppose, any debtor-in-possession financing or the use of cash collateral not approved by the Required Consenting Lenders.

StickCo Companies and Media Parent Termination Events. Any StickCo Company or Media Parent may terminate the Restructuring Support Agreement as to all parties upon three (3) Business Days' prior written notice thereof to all Required Consenting Lenders, upon the occurrence of any of the following events (each, a "**StickCo Termination Event**"; and together with the Lender Termination Events, each an "**Agreement Termination Event**"): (a) the breach by any Required Consenting Lender of any of the obligations, representations, warranties or covenants of such Required Consenting Lender set forth in the Restructuring Support Agreement, which breach (x) has a material adverse effect on the StickCo Companies, taken as a whole, or their ability to consummate the Restructuring or the Prepackaged Bankruptcy Proceeding and (y) remains uncured for a period of three (3) Business Days after receipt by the Required Consenting Lenders of a written notice from any StickCo Company or Media Parent of such breach; or (b) the occurrence of any of the events specified in Section 4(a), (b) and (g) of the Restructuring Support Agreement.

Effect of Termination. Upon the written election of the Required Consenting Lenders (in the case of a Lender Termination Event) or any StickCo Company or Media Parent (in the case of a StickCo Termination Event) to terminate the Restructuring Support Agreement as a result of an Agreement Termination Event, (i) the Restructuring Support Agreement will be of no further force and effect and each party thereto will be released from its commitments, undertakings and agreements under or related to the Restructuring Support Agreement (unless otherwise stated therein) and will have the rights and remedies that it would have had it not entered into the Restructuring Support Agreement, and will be entitled to take all actions, whether with respect to a restructuring of the Company or otherwise, that it would have been entitled to take had it not entered into the Restructuring Support Agreement; provided, however, that no such termination will relieve any Party from liability for its breach or non-performance of its obligations under the Restructuring Support Agreement occurring on or prior to such termination and (ii) all consents tendered by the Required Consenting Lenders with respect to the Restructuring and/or the Plan, if applicable, will be deemed revoked (and if Bankruptcy Court permission will be required for a Required Consenting Lender to change or withdraw, or cause to be changed or withdrawn, its vote in favor of the Plan, no Party to the Restructuring Support Agreement will oppose any attempt by such Required Consenting Lender to change or withdraw, or cause to be changed or withdrawn, such vote). Notwithstanding anything to the contrary contained in the Restructuring Support Agreement or in the Prepetition Credit Agreement, the termination of the Restructuring Support Agreement or any party's obligations thereunder will not affect any payments or other transfers that have been made to the Prepetition Agent or any of the Required Consenting Lenders prior to the date of such termination, and the Prepetition Agent and each Required Consenting Lender will be entitled to retain, and will not be required to return, any such payments or transfers.

## C.   ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

In order to facilitate the Chapter 11 Cases and minimize disruption to the Company's operations, the Company will seek certain relief, including but not limited to, the relief summarized below. There is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

### 1.   Voluntary Petitions

The following entities of the Company will file chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: AR Broadcasting Holdings, Inc., AR Broadcasting, LLC, and AR Licensing, LLC.

### 2.   Expected Timetable of the Chapter 11 Cases

The Company expects the Chapter 11 Cases to proceed quickly. The Company has been in extensive negotiations with its Prepetition Lenders to deleverage their balance sheet and complete a financial restructuring.

The Company cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Company. On the Petition Date, the Company will request the Bankruptcy Court to set

a hearing date to approve this Disclosure Statement and to confirm the Plan. Furthermore, the timetable is dependent on obtaining the needed approvals from the FCC (as discussed in ARTICLE IF above).

### 3. FCC Filings

Following the Petition Date, the Company will file the FCC Short-Form Transfer Application seeking the FCC's consent to the pro forma assignment of its FCC licenses from the Debtors to the Debtors as "debtors-in-possession". The Debtors will also file the FCC Long-Form Transfer Application to obtain approval of the transfer of control of the Company under the Plan. The FCC Short-Form Transfer Application can be granted during the course of the Chapter 11 Cases, and it is not subject to formal petitions to deny. The FCC will not grant the FCC Long-Form Transfer Application, however, until after, among other things: (1) a public review period during which interested parties may file petitions to deny the application; and (2) the Bankruptcy Court has approved the Plan.

### 4. First Day Relief

The Company intends to present certain motions (the **"First Day Motions"**) to the Bankruptcy Court on the Petition Date seeking relief. The First Day Motions include, but are not necessarily limited to, the following:

> a. Approval of Solicitation Procedures and Scheduling of Confirmation Hearing

To expedite the Chapter 11 Cases, the Company intends to seek an order setting dates for hearings to (i) approve the adequacy of the Disclosure Statement, (ii) approve the procedures for the Solicitation, and (ii) confirm the Plan.

> b. Payment of Unimpaired Claims in the Ordinary Course of Business

By this motion, the Company will seek authority to pay their prepetition unsecured Claims and other claims that are not Impaired under the Plan as such Claims become due in the Company's ordinary course of business. The Company will not seek to pay the Unimpaired claimants the total aggregate amounts outstanding on the Petition Date; rather, the Company will seek authority only to pay such amounts as they become due in their ordinary course of business.

> c. Motion to (i) Extend Time for Filing Schedules and SOFA and Waive Requirement Upon Confirmation and (ii) Request No Committee be Appointed

By this motion, the Company will seek the entry of an order, (i) granting the Debtors additional time to file their (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statements of financial affairs, (ii) permanently waiving the requirements to file the same upon confirmation of the Plan, and (iii) directing the Office of the United States Trustee not to convene a meeting of creditors in the Debtors' bankruptcy cases.

> d. Customer Programs and Practices

Under this motion, the Company intends to obtain authority to honor, exercise, and perform all their respective rights and obligations (whether prepetition or postpetition) arising in the ordinary course of business under, in connection with, and in furtherance of their existing customer agreements.

> e. Motion Permitting Debtors to Maintain Existing Cash Management System

The Company will seek authority to maintain their prepetition cash management systems (including bank accounts) after commencement of the Chapter 11 Cases.

> f. Creditor Matrix

The Company will seek authority on the Petition Date to prepare a list of creditors in lieu of submitting a formatted mailing matrix, file a consolidated list of the Company's thirty largest unsecured creditors, and mail initial notices to facilitate the administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith.

g.      Wages

The Company will seek authority to pay all employees their wage Claims in the ordinary course of business. Additionally, the Company intends to continue their prepetition benefit programs.

h.      Sales, Use, and Franchise Tax

The Company will seek authority to pay certain sales, use, and franchise taxes in the ordinary course of business.

i.      Insurance The Company maintains a variety of insurance policies, including general liability, worker's compensation, directors & officers liability, and other policies. In order to avoid any potential lapse of coverage and the expense of acquiring new coverage, and to continue prepetition premium financing arrangements, the Company will request authority to pay all prepetition premiums in the ordinary course of business.

j.      Utilities

The Company will move the Court on the Petition Date to enter orders approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Company is not required to provide any additional adequate assurance pending entry of a Final Order.

k.      Interim Compensation Procedures

The Company will seek authority on the Petition Date to establish procedures for the interim compensation and reimbursement of Retained Professionals in the Chapter 11 Cases.

l.      Use of Cash Collateral

The Company will seek authority on the Petition Date to use the Prepetition Lenders' cash collateral.

m.      Other Procedural Motions and Professional Retention Applications

The Company also plans to file several procedural motions that are standard in Chapter 11 Cases, as well as applications to retain the professionals who will be assisting the Company during these Chapter 11 Cases.

## ARTICLE IV
## THE JOINT PLAN

**This section provides a summary of the Plan, including classification and treatment of Claims and Interests thereunder, and is qualified in its entirety by reference to the Plan. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

**The Plan controls the treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Interests in the Company, the Debtors' estates, the Reorganized Debtors, all parties receiving property under the Plan and other parties in interest.**

**A.    ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

**1.    Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are excluded from the Classes of Claims and Equity Interests designated in Article III of the Plan.

2. **Administrative Claims**

Each holder of an Allowed Administrative Claim shall, in full and final satisfaction of such Claim, be paid in full in the ordinary course of business in accordance with applicable law and/or Final Order of the Bankruptcy Court and/or terms of any agreement that governs such Claim.

3. **Priority Tax Claims**

Each holder of a Priority Tax Claim shall, in full and final satisfaction of such Claim, be paid in full in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

B. **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

1. **Summary**

   a. Pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Claims and Equity Interests for all purposes, including voting, confirmation, and distribution under the Plan. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed placed in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such other Class.

   b. Summary of Classification and Treatment of Claims and Equity Interests

   | Class | Claims and Equity Interests | Status | Voting Rights |
   |---|---|---|---|
   | 1 | Other Priority Claims | Unimpaired | Deemed to accept |
   | 2 | Prepetition Credit Facility Claims | Impaired | Entitled to vote |
   | 3 | Other Secured Claims | Unimpaired | Deemed to accept |
   | 4 | General Unsecured Claims | Unimpaired | Deemed to accept |
   | 5 | Intercompany Claims | Unimpaired | Deemed to accept |
   | 6 | Holdings Equity Interests | Impaired | Deemed to reject |
   | 7 | StickCo Equity Interests | Unimpaired | Deemed to accept |

   c. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2. **Classification and Treatment of Claims and Equity Interests**

   a. Class 1—Other Priority Claims

      (i) *Classification*: Class 1 consists of Other Priority Claims.

      (ii) *Treatment*: Each holder of an Other Priority Claim shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of the Debtors: (i) full payment in Cash of its Other Priority Claim; or (ii) other treatment of its Other Priority Claim in a manner that leaves such Claim Unimpaired.

      (iii) *Voting*: Class 1 is Unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Other Priority Claims are conclusively presumed to have accepted the Plan without the need for solicitation of acceptances with respect to Class 1 from holders of Other Priority Claims.

   b. Class 2—Prepetition Credit Facility Claims

      (i) *Classification*: Class 2 consists of Prepetition Credit Facility Claims.

      (ii)    *Treatment*: Subject to Articles IV.A.7 and IV.B.6 of the Plan, on or as soon as practicable after the Effective Date, each holder of a Prepetition Credit Facility Claim shall receive, in full and final satisfaction of such Claim, its pro rata share of: (a) the New Term Loan Interests; and (b) the Lender Equity Distribution.

      **(iii)**    *Voting*: Class 2 is Impaired, and holders of Prepetition Credit Facility Claims are entitled to vote to accept or reject the Plan.

c.    Class 3—Other Secured Claims

      (i)    *Classification*: Class 3 consists of Other Secured Claims. Each holder of an Other Secured Claim shall be placed in a separate subclass, and each subclass shall be treated as a separate Class for distribution purposes.

      (ii)    *Treatment*: Each holder of an Other Secured Claim shall receive, in full and final satisfaction of such Claim, in the sole discretion of the Debtors, either: (i) the collateral securing such Other Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Other Secured Claim, including, to the extent applicable, postpetition interest under section 506(b) of the Bankruptcy Code; or (iii) other treatment of its Other Secured Claim in a manner that leaves such Claim Unimpaired.

      **(iii)**    *Voting*: Class 3 is Unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Other Secured Claims are conclusively presumed to have accepted the Plan without the need for solicitation of acceptances with respect to Class 3 from holders of Other Secured Claims.

d.    Class 4—General Unsecured Claims

      (i)    *Classification*: Class 4 consists of General Unsecured Claims.

      (ii)    *Treatment*: Each holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, payment or satisfaction in the ordinary course of business in accordance with applicable law and terms of any agreement that governs such General Unsecured Claim or in accordance with the course of practice between the Debtors and such holder.

      **(iii)**    *Voting*: Class 4 is Unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of General Unsecured Claims are conclusively presumed to have accepted the Plan without the need for solicitation of acceptances with respect to Class 4 from holders of General Unsecured Claims.

e.    Class 5—Intercompany Claims

      (i)    *Classification*: Class 5 consists of Intercompany Claims.

      (ii)    *Treatment*: Intercompany Claims shall be, in full and final satisfaction of such Claims, reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

      (iii)    *Voting*: Class 5 is Unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Intercompany Claims are conclusively presumed to have accepted the Plan without the need for solicitation of acceptances with respect to Class 5 from holders of Intercompany Claims.

f.    Class 6—Holdings Equity Interests

      *(i)*    *Classification:* Class 6 consists of Holdings Equity Interests.

(ii)    *Treatment:* The holder of the Holdings Equity Interests shall not receive any distribution under the Plan on account of the Holdings Equity Interests.

(iii)    *Voting:* Class 6 is Impaired, and the holder of Holdings Equity Interests is deemed to reject the Plan.

g.    Class 7—StickCo Equity Interests

(i)    *Classification:* Class 7 consists of StickCo Equity Interests.

(ii)    *Treatment:* Each holder of a StickCo Equity Interest shall retain, in full and final satisfaction of such StickCo Equity Interest, its pro rata share of the StickCo Equity Interests.

(iii)    *Voting:* Class 7 is Unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of StickCo Equity Interests are conclusively presumed to have accepted the Plan without the need for solicitation of acceptances with respect to Class 7 from holders of StickCo Equity Interests.

**3.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or Reorganized Debtors' rights in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to, counterclaims against, or setoffs or recoupments against any such Unimpaired Claim.

**4.    Settlements Between the Debtors or Reorganized Debtors and Holders of Claims**

Notwithstanding the classification and treatment of Claims and Equity Interests in Article III of the Plan, consistent with section 1123(a)(4), the Debtors or Reorganized Debtors may agree with the holder of a Claim or Equity Interest to provide such holder with a less favorable treatment of its Claim or Equity Interest than provided in Article III of the Plan.

**C. MEANS FOR IMPLEMENTATION OF THE PLAN**

    **1.**      **Continued Corporate Existence, Vesting of Assets in the Reorganized Debtors, and Corporate Governance**

        a.      On the Effective Date, all assets of each Estate shall vest in the respective Reorganized Debtor free and clear of all Claims, interests, Liens, charges, or other encumbrances except to the extent otherwise provided in the Plan or in the Confirmation Order.

        b.      On and after the Effective Date, the Reorganized Debtors may engage in any act or activity authorized by the existing organizational documents or New Organizational Documents, as the case may be, without the Bankruptcy Court's supervision or approval, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or Confirmation Order.

        c.      On the Effective Date, any provision in any operating agreement, partnership agreement, limited liability company agreement, or any other organizational document of any Debtor or Reorganized Debtor requiring dissolution, liquidation, or withdrawal of a member upon insolvency, bankruptcy, or the filing of chapter 11 cases: (a) is deemed waived and of no further force and effect for any act or occurrence on or prior to the Effective Date; and (b) any action taken to prevent or revoke such potential dissolution or liquidation by the Debtors or Reorganized Debtors or potential withdrawal of any such Debtors or Reorganized Debtors from the applicable limited liability company or partnership is ratified and deemed effective to prevent such dissolution or liquidation and each such Debtor or Reorganized Debtor shall continue its existence regardless of any such provision.

        d.      Prior to, on, or after the Effective Date, as applicable, all matters provided for in the Plan that would otherwise require approval of the shareholders, members, managers, partners, or directors of the Debtors or Reorganized Debtors shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date, as applicable, pursuant to applicable state law, including the general corporation or limited liability company law of the state where such Debtor or Reorganized Debtor is incorporated, without any requirement of further action by the shareholders, members, directors, managers, or partners of the Debtors or Reorganized Debtors.

        e.      On and after the Effective Date, the Debtors and Reorganized Debtors and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

        f.      The composition of the new directors and managers of the Reorganized Debtors on the Effective Date shall be as set forth in the Plan Supplement.

        g.      Upon written election of the Required Consenting Lenders and subject to the reasonable consent of the Debtors and Media Parent, the Debtors shall create an FCC Trust, administered pursuant to a liquidating trust agreement acceptable to the Required Consenting Lenders and reasonably acceptable to the Debtors and Media Parent, into which, pursuant to the Confirmation Order and subject to any required FCC approvals, the New Holdings Equity and New Holdings Warrants shall be transferred on the Effective Date. If such written election is exercised and subject to such consents, the Debtors shall cooperate with the Required Consenting Lenders in taking the necessary and appropriate actions related to the creation of the FCC Trust and the transfer of the

New Holdings Equity and the New Holdings Warrants thereto.

h. Upon written election of the Required Consenting Lenders, the Debtors shall merge or otherwise consolidate AR Broadcasting Holdings, Inc. and AR Broadcasting, LLC in a manner acceptable to the Required Consenting Lenders, and at the expense of the Required Consenting Lenders take all necessary or appropriate actions related thereto.

2. **Cancellation of Securities and Agreements, Issuance of New Holdings Equity and New Holdings Warrants, New Term Loan Credit Agreement, and Agent Fees**

a. Upon the completion and effectiveness of the distribution required under Article III.C.6 of the Plan, all notes, stock, instruments, certificates, and other documents evidencing the Holdings Equity Interests shall be canceled and of no further force, whether surrendered for cancellation or otherwise, and the obligation of the Debtors thereunder or in any way related thereto shall be discharged.

b. On the Effective Date, the Reorganized Debtors shall issue or reserve for issue the New Holdings Equity to the holders of Prepetition Credit Facility Claims and the New Holdings Single Majority Stockholder, and New Holdings Warrants to the holders of Prepetition Credit Facility Claims.

c. The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions as well as, to the extent applicable, section 1145of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the solicitation of acceptances of the Plan from holders of claims.

d. On the Effective Date, the Reorganized Debtors shall enter into the New Term Loan Credit Agreement.

e. On the Effective Date, the Prepetition Credit Facility Claims shall be fully and finally satisfied through the right of each holder of a Prepetition Credit Facility Claim to receive the distributions to be made to each such holder pursuant to the terms of the Plan. In connection with such satisfaction, the Prepetition Credit Agreement and the Prepetition Credit Facility shall be, on the Effective Date, terminated and of no further force and effect, except for all obligations and agreements of any Debtor or the Prepetition Lenders thereunder in favor of the Prepetition Agent or any other "Agent-Related Person" (as that term is defined in the Prepetition Credit Agreement) which by their express terms are intended to survive termination of the Prepetition Credit Agreement, and any other right of compensation, reimbursement or indemnification in favor of the Prepetition Agent or any other Agent-Related Person, all of which will continue in full force and effect and shall be honored by, as applicable, the Debtors, Reorganized Debtors, or Prepetition Lenders.

f. Upon the execution of the New Term Loan Credit Agreement by the Debtors and the Required Consenting Lenders, and the satisfaction or waiver of all conditions precedent set forth therein, the New Term Loan Credit Agreement shall be effective and binding upon the Debtors and each holder of a Prepetition Credit Facility Claim that has executed such documents, and each such holder of a Prepetition Credit Facility Claim that has executed such documents shall be deemed to have received its pro rata share of the New Term Loan Interests at such time. Any holder of a Prepetition Credit Facility Claim that has not executed within sixty days of the Effective Date (or such later deadline set by the New Term Loan Agent) the New Term Loan Credit Agreement and any other document in connection therewith that the New Term Loan Agent reasonably determines to be necessary shall be deemed to have abandoned its pro rata share of the New Term Loan Interests, and such holder's share of the New Term Loan Interests shall immediately be distributed pro rata to holders of Prepetition Credit Facility Claims that have executed

such documents within sixty days of the Effective Date (or such longer period set by the New Term Loan Agent).

g. The Reorganized Debtors shall not issue New Holdings Equity to the New Holdings Single Majority Stockholder until the New Holdings Single Majority Stockholder Agreements are effective and binding on each party thereto.

## D. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Assumption of Executory Contracts and Unexpired Leases

a. Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease: (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to reject filed on or before the entry of the Confirmation Order; or (d) is set forth in the Plan Supplement as an executory contract or unexpired lease to be rejected. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above as of the Effective Date.

b. Subject to the consent of the Required Consenting Lenders and Media Parent, the Debtors are authorized to assign executory contracts, unexpired leases, or other agreements to Media Parent, or any affiliate thereof, pursuant to the terms of the Other Restructuring Agreements or otherwise.

### 2. Payments Related to Assumption of Executory Contracts and Unexpired Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed or assumed and assigned by the Reorganized Debtors is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on or as soon as practicable after the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding the amount of a cure payment, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other matter pertaining to assumption or assumption and assignment: (1) the Reorganized Debtors retain the right to reject the applicable executory contract or unexpired lease at any time prior to the resolution of the dispute; and (2) cure payments shall only be made following either the entry of a Final Order resolving the dispute or consensual resolution of the dispute. The Reorganized Debtors may settle any such dispute without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors or Reorganized Debtors, as applicable, from counterparties to rejected executory contracts or unexpired leases.

### 4. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan. Modifications, amendments, supplements, and restatements to prepetition executory

contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 5. Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any Debtors or Reorganized Debtors have any liability thereunder. If a dispute exists regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## E.   PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2. Distributions on Account of Claims Allowed After the Effective Date

#### a. Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

#### b. Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed.

### 3. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### a. Delivery of Distributions in General

Except as otherwise provided in the Plan, the Reorganized Debtors shall make distributions to holders of Allowed Claims at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however,* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

#### b. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then current address of such holder, at

which time such distribution shall be made to such holder without interest; *provided, however,* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is of six months after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property, or the Equity Interest in property, shall be discharged and forever barred.

### c. Compliance with Tax Requirements/Allocations

The Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with tax withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors are authorized to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Distributions shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 4. Setoffs

Other than with respect to the Prepetition Credit Facility Claims, each Reorganized Debtor may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), pursuant to applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim or Equity Interest, set off against any Allowed Claim or Equity Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any distribution is made on account of such Allowed Claim or Equity Interest) any Claims, rights, and Causes of Action of any nature that such Reorganized Debtor may hold against the holder of such Allowed Claim or Equity Interest, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), without notice, leave or order of the Bankruptcy Court; *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.

### 5. Claims Paid or Payable by Third Parties

### a. Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be deemed disallowed without any further notice to the holder of the Claim or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate which was in effect as of the Petition Date on such amount owed for each day after the two-week grace period specified above until the amount is repaid.

### b. Claims Payable by Third Parties

The Reorganized Debtors shall not be required to make any distributions under the Plan on account of an Allowed Claim that is payable pursuant to an insurance policy until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that an insurer agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement,

such Claim is deemed expunged without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance.

F.    **ALLOWANCE OF CLAIMS**

1.    **Allowance**

   a.    Any Claim that is not Disputed shall be Allowed in the amount contained in the Debtors' books and records, except as provided in Articles III.D, VI.D and VI.E of the Plan.

   b.    Any Claim as to which liability and amount are determined by a Final Order of the Bankruptcy Court (or such other court or forum as the Debtors and the holder of such Claim agree to or as the Bankruptcy Court may direct) shall be Allowed in such amount.

   c.    No Disputed Claim shall be Allowed except in the amount either agreed upon between the holder of such Claim and the Debtors or as determined by a Final Order of the Bankruptcy Court (or such other court or forum as the Debtors and the holder of such Claim agree to or as the Bankruptcy Court may direct).

2.    **Objections to Claims**

   a.    The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

   b.    The Debtors and the Reorganized Debtors, as applicable, may object to any Claim not expressly Allowed under the Plan within 120 days of the later of the date on which the Claim becomes a Disputed Claim or the Effective Date; *provided, however*, that the Reorganized Debtors may seek extensions of this date from the Bankruptcy Court.

3.    **Procedures Regarding Disputed Claims**

   a.    Holders of Claims shall not be required to file a proof of Claim.

   b.    Unless Disputed, Claims shall be deemed to be asserted in and Allowed in the amount set forth in the books and records of the Reorganized Debtors, except as provided in Articles III.D, VI.D and VI.E of the Plan.

   c.    If the holder of a Claim disagrees with the Reorganized Debtors' books and records with respect to the amount of such holder's Claim, such holder must so advise the Reorganized Debtors in writing prior to the later of 60 days after the Effective Date or 30 days after such holder is informed by the Reorganized Debtors of the amount of such holder's Claim set forth in their books and records, in which event the Claim will become a Disputed Claim. In the event such holder and the Reorganized Debtors are not able to consensually resolve the dispute, the Reorganized Debtors may file, in their discretion as applicable, an objection to or adversary proceeding concerning the Claim or a motion with the Bankruptcy Court to determine the Allowed amount of such Claim.

   d.    Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses the Debtors had with respect to any Claim.

   e.    The Debtors or Reorganized Debtors, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether a proof of Claim has been filed or

such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

  f.  To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, without any interest to be paid on account of the time period during which such Claim was Disputed.

**4.** **No Distributions Pending Payment of Money or Property to the Debtors**

All Claims of any Entity that owes money or property to or asserts disputed possession of or control over property of the Debtors shall be deemed to be Disputed and shall not be Allowed unless and until such Entity pays in full any amount or returns any property of or owed to the Debtors.

**5.** **Expressly-Allowed Claims and Equity Interests**

  a.  The Prepetition Credit Facility Claims and the StickCo Equity Interests are Allowed and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, objection, or any other challenges under any applicable law or regulation by any Entity.

  b.  All Prepetition Credit Facility Agent Claims are Allowed as Administrative Claims and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, objection, or any other challenges under any applicable law or regulation by any Entity.

**G.** **SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**1.** **Discharge of Claims and Termination of Equity Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date (regardless of when a distribution is made), of Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (2) the holder of such a Claim or Equity Interest has accepted the Plan. Any default by the Debtors or their affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on

account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any governmental unit thereof specified in section 101(27) of the Bankruptcy Code. The actions of the Securities and Exchange Commission that (1) are non-pecuniary, (2) do not relate to collection of a Claim, or (3) do not pursue injunctions that could be reduced to a monetary Claim, are not discharged under Article VIII.A of the Plan.

### 2. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 3. Compromise and Settlement of Claims and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Equity Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### 4. Releases by the Debtors

**Upon the occurrence of the Effective Date, each of the Debtors and Reorganized Debtors are deemed to release all Retained Professionals, the Prepetition Lenders, the Prepetition Agent, Media Parent and each of their respective Representatives, affiliates, and successors-in-interest, from any and all Causes of Action that the Debtors or Reorganized Debtors otherwise would be entitled to assert (whether individually or collectively).**

### 5. Exculpation

**None of the Debtors, Reorganized Debtors, each of their respective Representatives (subject to, with regard to current and former officers and directors, fiduciary duties under relevant corporate law, including duties of loyalty) and successors-in-interest, nor outside legal counsel to the Prepetition Agent and Media Parent, shall have or incur any liability to any Entity for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases or restructuring of the Debtors, including formulating, negotiating, preparing, disseminating, implementing, administering, confirming, soliciting or effecting the Plan or any contract, instrument, release, agreement, or other document created or entered into in connection with the Plan; _provided, however_, that the foregoing shall not affect the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud or criminal misconduct, or an _ultra vires_ act; _provided, further_, that each of the above-listed Entities shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities in connection with, or under, the above-referenced acts or omissions; _provided, further_, that under no circumstance shall the foregoing exculpation apply to Media Parent or any affiliate of Media Parent.**

6. **Third Party Release**

As of the Effective Date, each holder of a Claim or Equity Interest voting to accept the Plan or deemed to accept the Plan, and each other holder of a Claim or Equity Interest to the fullest extent permitted by law as such law may be extended or interpreted subsequent to the Effective Date, are deemed to release the Prepetition Lenders, the Prepetition Agent, outside legal counsel to the Debtors, Media Parent, and each of their Representatives and successors-in-interest from any and all Causes of Action relating to Claims asserted against the Debtors; *provided, however,* that under no circumstance shall the Internal Revenue Service be deemed to provide such third party release pursuant to Article VIII.F of the Plan to Media Parent or Media Parent's Representatives.

7. **Injunction**

Except as otherwise expressly provided in the Plan or Confirmation Order, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to Article VIII.D of the Plan or Article VIII.F of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtors: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the entry of the Confirmation Order, and notwithstanding an indication in a proof of Claim or Equity Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.

8. **Recoupment**

In no event shall any holder of Claims or Equity Interests be entitled to recoup any Claim or Equity Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors before the entry of the Confirmation Order.

9. **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

10. **Waiver or Estoppel**

Each holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the entry of the Confirmation Order.

11. **Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action that a Debtor may hold against any Entity, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Entity on or prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of the Plan or occurrence of the Effective Date.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

12. **Indemnification Agreement**

**Notwithstanding anything to the contrary in the Plan (including in Article VIII of the Plan), nothing in the Plan shall release Media Parent from any of its obligations under the Indemnification Agreement.**

## H.   CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

1. **Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan that must be satisfied or waived in accordance with Article IX.C of the Plan:

a.      The Confirmation Order is reasonably acceptable to the Debtors, Media Parent, and the Required Consenting Lenders.

b.      The Plan Supplement shall be in form and substance reasonably acceptable to the Debtors, Media Parent and the Required Consenting Lenders.

c.      The Restructuring Support Agreement has not been terminated.

d.      The FCC Long-Form Transfer Application is acceptable to the Required Consenting Lenders in their sole discretion and has been submitted to the FCC.

2. **Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article IX.C of the Plan:

    a.    The Confirmation Order is a Final Order.

    b.    Contemporaneous effectiveness of the New Term Loan Credit Agreement.

    c.    Either: (a) the FCC has granted its consent approving the FCC Long-Form Transfer Application, which consent is not subject to materially adverse conditions, is in a form reasonably acceptable to the Required Consenting Lenders, and is an FCC Final Order; or (b) an FCC Trust has been created pursuant to Article IV.A.8 of the Plan, into which the New Holdings Equity and New Holdings Warrants have been transferred, which transfer has been approved by the FCC by FCC Final Order in a form reasonably acceptable to the Required Consenting Lenders.

    d.    The Plan Supplement shall be in form and substance reasonably acceptable to the Required Consenting Lenders.

    e.    Contemporaneous effectiveness of the Other Restructuring Agreements.

    f.    The New Holdings Single Majority Stockholder Agreements are effective and binding on each party thereto.

    g.    The Restructuring Support Agreement has not been terminated.

3. **Waiver of Conditions Precedent to the Effective Date**

Subject to the terms and conditions of the Restructuring Support Agreement, without notice, leave or order of the Bankruptcy Court or any formal action, the conditions precedent to the Effective Date: (1) set forth in Article IV.H.2.a. through IV.H.2.c. may be waived by the Debtors with the prior written consent of the Required Consenting Lenders; (2) set forth in Article IV.H.2.d. through IV.H.2.d.f. may be waived by the Required Consenting Lenders in their sole discretion; (3) set forth in Article IV.H.2.g. may be waived by the Required Consenting Lenders in their sole discretion if a "Lender Termination Event" (as that term is defined in the Restructuring Support Agreement) has occurred; and (4) set forth in Article IV.H.2.g. may be waived by the Debtors in their sole discretion if a "StickCo Termination Event" (as that term is defined in the Restructuring Support Agreement) has occurred.

4. **Deferral of Effective Date**

The Debtors, with the consent of the Required Consenting Lenders, may defer the occurrence of the Effective Date without notice, leave or order of the Bankruptcy Court.

## I.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

    1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     Ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide, or resolve any and all matters related to Causes of Action that the Debtors or Reorganized Debtors are legally entitled to assert (whether individually or collectively);

7.     Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.     Enter and implement such orders as may be necessary or appropriate to execute or implement the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the occurrence of the Effective Date or the enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, unless such contract, instrument, release, indenture, or other agreement or document contains express enforcement or dispute resolution provisions to the contrary;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.  Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.  Determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.  Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, unless such agreement, document, or instrument contains express enforcement or dispute resolution provisions to the contrary;

21.  Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.  Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.  Enforce all orders previously entered by the Bankruptcy Court; and

24.  Hear any other matter not inconsistent with the Bankruptcy Code.

## J.  MISCELLANEOUS PROVISIONS

### 1.  Separate Plans

The Plan shall be treated as a separate plan of reorganization for each Debtor.

### 2.  Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective, enforceable, binding upon the Debtors, Reorganized Debtors, any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all nondebtor parties to executory contracts and unexpired leases with the Debtors.

### 3.  Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents in form and substance reasonably acceptable to the Required Consenting Lenders as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and Confirmation Order.

### 4.  Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of title 28 of the United States Code, 28 U.S.C. § 1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## 5. Retained Professionals and Post-Effective Date Professionals

All final requests for Accrued Professional Compensation shall be filed with the Bankruptcy Court no later than forty-five days after the Effective Date. An order, if any, issued by the Bankruptcy Court allowing Retained Professionals to seek interim compensation shall remain in full force and effect.

On or before the Effective Date, the Retained Professionals shall deliver an estimate of their Accrued Professional Compensation prior to and as of the Effective Date the Debtors. If a Retained Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Retained Professional, and such estimate shall not be considered an admission with respect to the fees and expenses of such Retained Professional. On the Effective Date, the Reorganized Debtors shall fund an interest-bearing account with the New Term Loan Agent with Cash equal to the aggregate amount so estimated as of the Effective Date, and thereafter: (a) the escrow account shall be maintained in trust for the Retained Professionals; (b) funds in the escrow account are not property of the Reorganized Debtors; (c) upon order of the Bankruptcy Court or as agreed to by the Reorganized Debtors and a Retained Professional, Accrued Professional Compensation shall be paid in Cash to Retained Professionals from the escrow account; (d) after all Accrued Professional Compensation has been paid in full, amounts remaining in the escrow account, if any, shall be paid to the Reorganized Debtors; and (e) the Reorganized Debtors are responsible for payment of Accrued Professional Compensation that has been Allowed by the Bankruptcy Court, regardless of whether sufficient funds remain in the escrow account to make such payment.

After the Effective Date, the Reorganized Debtors may continue to, and may newly, employ and pay any professional (including those Entities that served as Retained Professionals) in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## 6. Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and shall accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

## 7. Dissolution of Committees

On the Effective Date, any committee appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

## 8. Reservation of Rights

The Plan shall have no force or effect until the Effective Date. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Equity Interests prior to the Effective Date.

## 9. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Entity.

## 10. Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture, organizational document, or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.

11.    Service of Documents

a.    After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

AR BROADCASTING, LLC
c/o Michael D. Messersmith
Kaye Scholer LLP
70 West Madison Street, Suite 4100
Chicago, IL 60602-4231

with a copy to:

LANDIS RATH & COBB LLP
Adam G. Landis
William E. Chipman, Jr.
919 Market Street, Suite 1800
Wilmington, DE 19801

b.    After the Effective Date, the Debtors have authority to notify Entities that any Entity that wishes to continue to receive documents pursuant to Bankruptcy Rule 2002 must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## 12.    Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

## 13.    Conflicts

To the extent that any provision of the Plan Supplement or any order (other than the Confirmation Order) referenced in the Plan conflicts with the Plan (excluding the Plan Supplement), the Plan (excluding the Plan Supplement) shall govern and control.

## ARTICLE V
## SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

## A.    THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- the appropriate Ballots and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Disclosure Statement with all exhibits, including the Plan.

The one voting class, Class 2 Claims (Prepetition Credit Facility Claims), entitled to vote to accept or reject the Plan will be served either paper copies or a CD-ROM containing the Disclosure Statement with all exhibits, including the Plan. Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Voting Agent by writing to StickCo Plan Voting, c/o Landis Rath & Cobb LLP, 919 Market Street,

Suite 1800, P.O. Box 2087, Wilmington, DE 19801, or calling (302) 467-4435. All parties entitled to vote to accept or reject the Plan will receive a paper copy of each appropriate Ballot.

## B. VOTING DEADLINE

The period during which Ballots with respect to the Plan will be accepted by the Company will terminate at 9:00 p.m. (prevailing Pacific time) on **November 10, 2011**, unless the Company, in its sole discretion, extends the date until which ballots will be accepted. Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for Confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion. There can be no assurance that the Company will exercise its right to extend the Voting Deadline.

The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code requires the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

## C. VOTING INSTRUCTIONS

Only the holders of Allowed Class 2 Claims (Prepetition Credit Facility Claims) are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan. Voting Instructions are attached to each Ballot.

The Company is providing the Solicitation Package to holders of Allowed Class 2 Claims (Prepetition Credit Facility Claims) whose names (or the names of their Nominees) appear as of the Voting Record Date in the records maintained by the Company or Prepetition Agent, as applicable.

The deadline by which the Voting Agent must receive your Ballot is 9:00 p.m. (prevailing Pacific time), on **November 10, 2011 (the "Voting Deadline")**.

| BALLOTS |
|---|
| 1. Ballots must be actually received by the Voting Agent by the Voting Deadline. In the interests of expedience, Ballots submitted electronically or by facsimile to the Voting Agent will be accepted by the Company. |
| 2. Please send your completed Ballot in the envelope provided. |
| 3. Ballots to be returned directly to the Voting Agent may also be sent by First Class Mail, Overnight Courier, or Personal Delivery to: |

```
StickCo Plan Voting
c/o LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19801

If you have any questions on the procedures for voting on the Plan,
please call counsel for the Debtors, William E. Chipman, Jr. at the
following telephone number:
(302) 467-4435
```

Any Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Class 2 Prepetition Credit Facility Claim must vote all of their Class 2 Claims within a particular Plan Class either to accept or reject the Plan and may not split their votes. By signing and returning a Ballot, each holder of a Class 2 Claim certifies to the Bankruptcy Court and the Company that no other Ballots with respect to such Class 2 Claim have been cast or, if any other Ballots have been cast with respect to such Class 2 Claim, such other Ballots are revoked.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.

1.      Note to holders of Class 2 - Prepetition Credit Facility Claims

By signing and returning a Ballot, each holder of a Class 2 Prepetition Credit Facility Claim will be certifying to the Bankruptcy Court and the Company that, among other things:

- the holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has cast the same vote with respect to all of its Claims in the same, respective Class;

- no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked.

**D.      VOTING TABULATION**

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim. Only holders of Class 2 Prepetition Credit Facility Claims will be entitled to vote with regard to such Claims.

Unless the Company decides otherwise, Ballots received after the Voting Deadline will not be counted. The method of delivery of the Ballots to be sent to LRC is at the election and risk of each holder of a Class 2 Prepetition Credit Facility Claim. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when LRC actually receives the original executed Ballot. In the interests of expedience, Ballots submitted electronically or by facsimile to the Voting Agent will be accepted by the Company. No Ballot should be sent to the Company, the Company's agents (other than LRC, the Company's Voting Agent), or the Company's financial or legal advisors.

If multiple Ballots are received from the same holder with respect to the same Class 2 Prepetition Credit Facility Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's

intent and will supersede and revoke any prior Ballot. Holders must vote all of their Class 2 (Prepetition Credit Facility Claims) within a particular Plan Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Class 2 (Prepetition Credit Facility Claims) within the same Class, the Company may, in their discretion, and to the extent possible, aggregate the Prepetition Credit Facility Claims of any particular holder within the particular Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Company will file with the Bankruptcy Court, on the Petition Date or as soon as practicable thereafter, the Voting Report prepared by LRC. The Voting Report will, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "**Irregular Ballot**") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or e-mail or damaged. The Voting Report also will indicate the Company's intentions with regard to such Irregular Ballots. Neither the Company nor any other person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## ARTICLE VI
## FINANCIAL PROJECTIONS

### A.     FINANCIAL PROJECTIONS

As a condition to plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Company's management has, through the development of the projections (the "**Projections**"), attached hereto as **Exhibit C**, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each holder of a Class 2 Prepetition Credit Facility Claim in determining whether to accept or reject the Plan.

The Company prepared the Projections in good faith, based upon estimates and assumptions made by the Company's management.

The estimates and assumptions in the Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Company's control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Company expects that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Projections. No representations can be made as to the accuracy of the Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Company considered or considers the Projections to reliably predict future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Company does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

The Company did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Company's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.

The Company does not, as a matter of course, publish projections of their anticipated financial position, results of operations or cash flows. Accordingly, the Company does not intend to, and disclaims any obligation to: (a) furnish updated projections to holders of Allowed Claims and Equity Interests; (b) include any such updated information in any documents that may be required to be filed with the SEC; or (c) otherwise make such updated information publicly available.

The Company periodically issues press releases reporting financial results and holders of Claims and Equity Interests are urged to review any such press releases when, and as, issued.

1.      Significant Assumptions

Although the forecasts represent the best estimates of the Company, for which the Company believes they have a reasonable basis as of the date hereof, of the results of operations and financial position of the Company after giving effect to the reorganization contemplated under the Plan, they are only estimates and actual results may vary considerably from forecasts. Consequently, the inclusion of the forecast information herein should not be regarded as a representation by the Company, the Company's advisors, or any other person that the forecast results will be achieved.

While, after the Effective Date, the Company does not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. Also they have been presented in lieu of pro forma historical financial information. Reference should be made to Article IX, entitled "Plan Related Risk Factors and Alternatives to Confirming and Consummating the Plan" for a discussion of the risks related to the Plan.

a.      Effective Date and Plan Terms

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Company including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses.

b.      Fresh Start Accounting

The Projections assume an Effective Date of January 1, 2012, and as required, the concepts of "Fresh Start Accounting" have been applied for periods after the Effective Date. These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code." Adoption of Fresh Start Accounting requires the determination of the reorganization value of the entity that emerges from bankruptcy. Reorganization value generally approximates fair value of the entity before considering liabilities.

The process of fair valuing of assets as part of fresh start accounting may result in changes to the carrying value of property, plant, and equipment or the creation of new intangibles for such items as customer contracts. The current Financial Projections assume no such differences. To the extent these occur in the process of revaluing long-lived assets the reorganization asset would be further adjusted from what is depicted in the current Financial Projections. The Company has engaged a third party appraisal firm to assist in determining these values.

## ARTICLE VII
## CONFIRMATION PROCEDURES

### A.  CONFIRMATION HEARING; APPROVAL OF SOLICITATION PROCEDURES

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing, and that any party in interest may object to Confirmation of the Plan.

On or about the Petition Date, the Company will seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure Statement, and confirmation of the Plan. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. The Company believes that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Company, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims and Equity Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Company believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### 1. Best Interests of Creditors Test/Liquidation Analysis

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each holder of an Allowed Claim or Equity Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what holders of Allowed Claims and Equity Interests in each Impaired Class would receive if the Chapter 11 Cases were converted to liquidation cases under chapter 7 of the Bankruptcy Code.

A conversion of the Chapter 11 Cases to chapter 7 cases would require the mandatory appointment of a trustee. The Debtors' costs of liquidation under chapter 7 would include, without limitation: (i) the reasonable compensation payable to the chapter 7 trustee and any attorneys or other professionals that such trustee may retain; (ii) asset disposition expenses; (iii) applicable taxes; (iv) litigation costs; and (v) Claims arising from the administration of the Debtors' Estates during the pendency of the Chapter 7 cases. Claims that may arise in the liquidation cases or result from the pending Chapter 11 Cases (including, without limitation any unpaid professional fees or administrative expenses that the Debtors incurred during the Chapter 11 Cases) would be paid in full from any unencumbered liquidation proceeds before the balance of those proceeds would be made available to pay General Unsecured Claims. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases (which otherwise would be assumed under the Plan) creating additional General Unsecured Claims against the Debtors' estates.

The Debtors submit that in order for a chapter 7 trustee to administer the estates responsibly, the trustee, and the trustee's staff and any retained professionals, would necessarily devote substantial time and effort to familiarizing themselves with the affairs of the Debtors business and the Chapter 11 Cases, including asset dispositions and the investigation of Claims. This would likely entail hundreds of hours of additional professional services and concomitant expenses. Not only would the costs increase as a result thereof, but the creditors would suffer a loss on the time-value of their money as the chapter 7 trustee, unfamiliar with the Debtors' affairs, claims and properties would necessarily require more time to liquidate the Debtors' assets, resolve disputed and unliquidated Claims and ultimately make distributions to creditors. Distributions of proceeds of the liquidation could be delayed pending the completion of such liquidation in order to resolve Claims and prepare for distributions. In the event litigation was necessary to resolve Claims asserted in the chapter 7 cases, distributions could be further prolonged.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases when compared to the proposed recoveries under the Plan, including: (a) the increased costs and expenses of a liquidation under chapter 7 arising from the additional Administrative Claims involved in the appointment of a liquidating trustee, as well as attorneys, financial advisors, accountants and other professionals to assist such trustee, (b) the possibility that a liquidation sale of the Debtors assets would not realize the full going concern value of the Debtor business, and (c) potential delays before holders of Claims or Equity Interests would receive any distribution, the Debtors have determined that Confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7. As set forth in more detail in the liquidation analysis[13] attached hereto as **Exhibit D** (the "**Liquidation Analysis**"), the Company believes that the value of any distributions in chapter 7 cases to each Impaired Class would be far less than the value of distributions contemplated under the Plan. Consequently, the Debtors believe that the Plan meets the requirements of section

---

[13] The Liquidation Analysis was prepared by management of the Debtors.

1129(a)(7) of the Bankruptcy Code because each Impaired Class will receive distributions that have a value at least equal to the value of the distribution that each such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

## 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates a Plan in which virtually all creditors will be paid in full, the Company's balance sheet will become materially deleveraged and the Company will receive critical benefits under certain agreements with Media Parent and its affiliates. In addition, as set forth in the Financial Projections attached hereto as **Exhibit C**, and because of anticipated benefits under the aforementioned agreements, the Company believes it will have sufficient funds to make all payments required by the Plan. For these reasons, the Company believes that the Plan meets the financial feasibility requirement.

## 3. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation that, except as described in the following section, each Class of Claims and Equity Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" (within the meaning of section 1124 of the Bankruptcy Code) is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two thirds in amount actually voting have voted to accept the plan.

The Claims and Equity Interests in Classes 1, 3, 4, 5 and 7 are not Impaired under the Plan, and as a result the holders of such Claims and Equity Interests are deemed to have accepted the Plan.

The Class 2 (Prepetition Credit Facility Claims) are Impaired under the Plan and are entitled to vote on the Plan. Class 2 (Prepetition Credit Facility Claims) will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

## 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims and Equity Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting Class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the plan; and (b) each holder of a secured claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

Because Class 6 is an Impaired Class deemed to have rejected the Plan, the Company will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, with the consent of the Required Consenting Lenders.

The Company submits the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## C.     RISK FACTORS

Prior to deciding whether and how to vote on the Plan, each holder of a Claim or Equity Interest should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article IX, entitled "Plan Related Risk Factors and Alternatives to Confirming and Consummating the Plan."

## D.     IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact: Counsel for the Debtors:

> LANDIS RATH & COBB LLP
> Adam G. Landis (No. 3407)
> William E. Chipman, Jr. (No. 3818)
> 919 Market Street, Suite 1800
> P.O. Box 2087
> Wilmington, DE 19801
>
> Telephone:     (302) 467-4435

## E.     DISCLAIMER

In formulating the Plan, the Company has relied on financial data derived from its books and records. The Company represents that, except as otherwise provided herein, statements made and information contained in the Disclosure Statement are true to the best of its knowledge. The Company cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court.

The discussion in the Disclosure Statement regarding the Company may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Company for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors, and other professionals employed by the Company have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Company, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by the Company shall have no liability for the information in the Disclosure Statement.**

**ARTICLE VIII**
**IMPLEMENTATION OF THE PLAN AND POSTPETITION**
**GOVERNANCE OF REORGANIZED DEBTORS**

**A.      BOARD OF DIRECTORS AND MANAGEMENT**

   **1.      Directors and Officers**

The Company will disclose in the Plan Supplement or an amendment thereto the identity and affiliation of any individual proposed to serve, after the Effective Date, as a director or officer of a Reorganized Debtor, as well as any insider (if any) that will be employed or retained by a Reorganized Debtor and the nature of compensation for such insider.

   **2.      Indemnification of Directors and Officers**

The Reorganized Debtors' articles of incorporation or formation, as applicable, may direct the Reorganized Debtors to indemnify and exculpate officers, directors or managers, and agents to the fullest extent permitted under the applicable state law.

**B.      EXIT FINANCING**

On the Effective Date, the Reorganized Debtors will enter into the New Term Loan Credit Agreement. Confirmation shall be deemed approval of the New Term Loan (including the transactions contemplated thereby, as well as actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein and the granting and creation of the security interests) and authorization for the Reorganized Debtors to enter into and execute the New Term Loan Credit Agreement, other loan documents in connection with the New Term Loan Credit Agreement, and such other documents as the New Term Loan Agent may require to effectuate the treatment afforded to the lenders under the New Term Loan facility.

# ARTICLE IX
## PLAN RELATED RISK FACTORS AND ALTERNATIVES
## TO CONFIRMING AND CONSUMMATING THE PLAN

**Prior to voting to accept or reject the Plan, all Impaired holders of Claims and Equity Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.**

### A.      GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, holders of Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.      Parties in Interest May Object to Company's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims and interests in such class. The Company believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Company created seven Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.      Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as soon as practicable thereafter, Confirmation of the Plan. If the Plan does not receive the required support from the voting Class, the Company may elect not to file the Chapter 11 Cases or to amend the Plan.

#### 3.      The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan

The Company cannot ensure that it will receive the requisite acceptances to confirm the Plan. Even if the Company receives the requisite acceptances, the Company cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or Equity Interest holder might challenge the adequacy of the Disclosure Statement or the Solicitation Procedures and results of voting as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. As discussed in further detail above in Article VII, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While the Company believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

Specifically, the releases provided to certain holders of Claims and Equity Interests in Article VIII of the Plan might not be approved by the Bankruptcy Court.

The Confirmation of the Plan is also subject to certain conditions as described in Article IX thereof. If the Plan is not confirmed, it is unclear what distributions holders of Claims and Equity Interests ultimately would receive with respect to their Claims and Equity Interests.

The Company, subject to the terms and conditions of the Plan, reserves the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. The Company May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Company reserves the right to object to the amount or classification of any Claim or Equity Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.

### 5. Risk of Non-Occurrence of the Effective Date

There can be no assurance that each of the conditions precedent to the Effective Date set forth in Article IX of the Plan will be met or, if met, will be met within any particular timeframe.

### 6. Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan

The distributions available to holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## C. FINANCIAL INFORMATION; DISCLAIMER

Although the Company has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement (which data could turn out to be incomplete or not accurate). The financial information contained herein, unless expressly indicated, is unaudited.

## D. FACTORS AFFECTING THE COMPANY

### 1. Risks Related to Media Parent after the Effective Date

Under the Management Agreement, Facilities Use Agreement, and Indemnification Agreement, the Company will have contractual relationships with Media Parent, as well as with an affiliate or affiliates of Media Parent, after the Effective Date, under which disputes and/or claims potentially could arise. In addition, potential business competition could exist in the proposed relationship between the Company and Media Parent after the Effective Date, including as a result of Media Parent's direct or indirect ownership and operation of radio stations in the same markets as the Company's stations. The Company could be adversely affected if Media Parent or its affiliates do not fulfill their obligations under the agreements.

### 2. Risks Related to the Company's Business

The Company's results of operations have been, and could continue to be, adversely affected by the downturn in the U.S. economy and in the local economies of the markets in which it operates. Revenue generated by the Radio Stations depends primarily upon the sale of advertising. Advertising expenditures, which the Company believes to be largely a discretionary business expense, generally tend to decline during an economic recession or downturn. Furthermore, because a substantial portion of the Company's revenue is derived from local advertisers, its

ability to generate advertising revenue in specific markets is directly affected by local or regional economic conditions. Consequently, the recent recession in the national economy and the economies of individual geographic markets in which the Company owns or operates stations will likely continue to adversely affect the Company's advertising revenue and, therefore, its results of operations. Further, any form of recovery would not guarantee an impact on advertising revenue.

3.       **The Company Operates in a Very Competitive Business Environment**

The radio broadcasting industry is very competitive. The Company's stations compete for listeners and advertising revenues directly with other radio stations within their respective markets, and some of the owners of those competing stations may have greater financial resources than the Company does.   The Radio Stations also compete with other media, such as newspapers, magazines, cable and broadcast television, outdoor advertising, satellite radio, the Internet and direct mail.  In addition, many of the Radio Stations compete with groups of two or more radio stations operated by a single operator in the same market.

Audience ratings and market shares fluctuate, and any adverse change in a particular market could have a material adverse effect on the revenue of stations located in that market. While the Company already competes with other stations with comparable programming formats in many of its markets, any one of the Radio Stations could suffer a reduction in ratings or revenue and could require increased promotion and other expenses, and, consequently, could have a lower Station Operating Income, if:

- another radio station in the market was to convert its programming format to a format similar to the Radio Stations or launch aggressive promotional campaigns;

- a new station were to adopt a competitive format; or

- an existing competitor was to strengthen its operations.

The Telecom Act allows for the consolidation of ownership of radio broadcasting stations in the markets in which the Company operates or may operate in the future.  Some competing consolidated owners may be larger and have substantially more financial and other resources than the Company does.

4.       **A Decrease in Market Ratings or Market Share Can Adversely Affect the Company's Revenues**

The success of each of the Radio Stations, is primarily dependent upon its share of the overall advertising revenue within its market. The Company cannot be sure that any of its stations can maintain or increase its current audience ratings or market share. In addition to competition from other radio stations and other media, as well as programming decisions and other actions taken by the Company and its employees, shifts in population, demographics, audience tastes, casualty events, and other factors beyond the Company's control could cause it to lose its audience ratings or market share. The Company's advertising revenue may suffer if any of its stations cannot maintain its audience ratings or market share.

5.       **The Company Must Respond to the Rapid Changes in Technology, Services and Standards to Remain Competitive**

The radio broadcasting industry is subject to technological change, evolving industry standards and the emergence of new media technologies and services. In some cases, the Company's ability to compete will be dependent on its acquisition of new technologies and its provision of new services, and the Company cannot assure that it will have the resources to acquire those new technologies or provide those new services; in other cases, the introduction of new technologies and services, including online music services, could increase competition and have an adverse effect on the Company's revenue. Recent new media technologies and services include the following:

- audio programming by cable television systems, direct broadcast satellite systems, Internet content providers (both landline and wireless), Internet-based audio radio services, smart phone and other mobile applications, satellite delivered digital audio radio service and other digital audio broadcast formats;

- HD Radio™ and digital radio, which could provide multi-channel, multi-format digital radio services in the same bandwidth currently occupied by traditional AM and FM radio services; and

- low power FM radio, which could result in additional FM radio broadcast stations in markets where the Radio Stations operate.

The Company also cannot assure that it will continue to have the resources to acquire other new technologies or to introduce new services that could compete with other new technologies. The Company cannot predict the effect, if any, that competition arising from new technologies may have on the radio broadcasting industry or on its business.

### 6. The Company Faces Many Unpredictable Business Risks

The Company's operations are subject to many business risks, including certain risks that specifically influence the radio broadcasting industry. These include:

- changing economic conditions, both generally and relative to the radio broadcasting industry in particular;

- shifts in population, listenership, demographics or audience tastes;

- the level of competition from existing or future technologies for advertising revenues, including, but not limited to, other radio stations, satellite radio, television stations, newspapers, the Internet, and other entertainment and communications media; and

- changes in laws as well as changes in governmental regulations and policies and actions of federal regulatory bodies, including the United States Department of Justice, the Federal Trade Commission and the FCC.

Given the inherent unpredictability of these variables, the Company cannot with any degree of certainty predict what effect, if any, these risks will have on its future operations. Any one or more of these variables may have a material adverse effect on the Company's future operations.

### 7. The Company is Exposed to Credit Risk on its Accounts Receivable

This risk is heightened during periods when economic conditions worsen. The Company's outstanding trade receivables are not covered by collateral or credit insurance. While the Company has procedures to monitor and limit exposure to credit risk on its trade receivables, there can be no assurance such procedures will effectively limit the Company's credit risk and avoid losses, which could have a material adverse effect on its financial condition and operating results.

### 8. The Company is Dependent on Personnel and Programming Agreements with Third Parties

The Company is managed by a small number of management and operating personnel, and the loss of one or more of these individuals could adversely impact its business. In addition, the Company employs on-air personalities and maintains programming agreements with third parties. The loss of one or more of these personalities or programming agreements could affect audience share.

### 9. The Broadcasting Industry is Subject to Extensive and Changing Federal Regulation

The radio broadcasting industry is subject to extensive regulation by the FCC under the Communications Act. The Company is required to obtain licenses from the FCC to operate its stations. Licenses are normally granted for a term of eight years and are renewable. Although the vast majority of FCC radio station licenses are routinely renewed, the Company cannot assure that the FCC will grant the Company existing or future renewal applications or that the renewals will not include conditions out of the ordinary course. The non-renewal, or renewal with conditions, of one or more of the Company's licenses could have a material adverse effect on it.

The Company must also comply with the extensive FCC regulations and policies in the ownership and operation of its radio stations. FCC regulations limit the number of radio stations that a licensee can own in a market, which could restrict the Company's future ability to acquire radio stations that would be material to its financial performance in a particular market or overall.

The FCC also requires radio stations to comply with certain technical requirements to limit interference between two or more radio stations. Despite those limitations, a dispute could arise whether another station is improperly interfering with the operation of one of the Company's stations or another radio licensee could complain to the FCC that one of the Company's stations is improperly interfering with that licensee's station. There can be no assurance as to how the FCC might resolve that dispute. These FCC regulations and others may change over time, and the Company cannot assure that those changes would not have a material adverse effect on it.

FCC regulations prohibit the broadcast of "obscene" material at any time, and "indecent" material between the hours of 6:00 a.m. and 10:00 p.m. The FCC has increased its enforcement efforts over the last few years with respect to these regulations. FCC regulatory oversight was augmented by recent legislation that substantially increased the penalties for broadcasting indecent programming (up to $325,000 for each incident), and subjected broadcasters to license revocation, renewal or qualification proceedings under certain circumstances in the event that they broadcast indecent or obscene material. The FCC has refrained from processing and disposing of thousands of complaints that have been filed because of uncertainty concerning the validity of prior FCC rulings, which are now being challenged in various courts. It is impossible to predict when courts will finally resolve outstanding issues and what, if any, impact those judicial decisions will have on any complaints that have been or may be filed against the Company's stations. Whatever the impact of those judicial decisions, the Company may in the future become subject to new FCC inquiries or proceedings related to the Radio Stations' broadcast of allegedly indecent or obscene material. To the extent that such an inquiry or proceeding results in the imposition of fines, a settlement with the FCC, revocation of any of the Company's station licenses or denials of license renewal applications, its results of operation and business could be materially adversely affected.

10. **The Company May Be Adversely Affected by Disruptions in Its Ability to Receive or Transmit Programming**

The transmission of programming is subject to the risk of equipment failure, including those caused by radio tower defects and destruction, natural disasters, power losses, low-flying aircraft, software errors or telecommunications errors. Disruption of programming transmissions may occur in the future and other comparable transmission equipment may not be available. Any natural disaster, such as an earthquake, or extreme climatic event, such as fire, could result in the loss of the ability to broadcast. In addition, to the extent insurance covers the business, it may be inadequate to cover damages or losses from a natural disaster or extreme climatic event.

Further, the Company owns, leases, or uses antenna and transmitter space for its radio stations. If it were to lose any of its antenna tower leases or if any of the towers or transmitters used for its stations are damaged, the Company may not be able to secure replacements on commercially reasonable terms, or at all, which could prevent it from transmitting signals. Disruptions in the Company's ability to receive or transmit broadcast signals could have a material adverse effect on audience levels, advertising revenues and future results of operations.

E. **SECURITIES TO BE ISSUED OR DISTRIBUTED UNDER THE PLAN**

1. **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Fulfill Their Obligations under the New Term Loan Credit Agreement**

The Reorganized Debtors may not be able to meet their projected financial results, and therefore may be unable to fulfill their obligations under the New Term Loan Credit Agreement.

2. **The Securities to be Issued or Distributed under the Plan May Be Illiquid**

There are liquidity constraints on the New Holdings Equity and New Holdings Warrants. The organizational documents of Reorganized AR Holdings will restrict the ability of holders of these securities to transfer them under certain circumstances, including (among other restrictions summarized in Article III.B above) transfers that would cause a violation of FCC foreign ownership or attribution regulations. In addition, the New

Holdings Equity and New Holdings Warrants will not be registered pursuant to the Securities Exchange Act of 1934, as amended, and therefore not listed on a public exchange or automated trading system.

### 3. The Estimated Recoveries Are Not Intended to Represent Private Sale Values of Securities

The estimated recoveries to holders of Prepetition Credit Facility Claims are not intended to represent the private sale values of New Term Loan Interests, New Holdings Equity, and New Holdings Warrants. The estimated recoveries are based on numerous assumptions, including the Debtors' ability to achieve certain operating and financial results and maintain adequate liquidity to fund operations, as well as capital and equity market conditions consistent with current market conditions. The price for such securities may also be influenced by market liquidity and any concentration of security ownership.

## F. CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to certain holders of Claims and to the Debtors, see Article XI below, entitled "Certain Federal Income Tax Consequences."

## G. FCC APPROVALS

Both the entry into Chapter 11 and the emergence from Chapter 11 require consent of the FCC. Under the Communications Act, the consent of the FCC is required for the transfer of control of an entity that holds or controls FCC licenses. Following the filing of their voluntary petitions under chapter 11, the Company will file applications seeking the FCC's consent to the pro forma assignment of its FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under Chapter 11. The Debtors will also file applications with the FCC to obtain approval of the transfer of control of the Company. The restructuring will not be implemented until the FCC has granted applications seeking approval of the new control structure.

*Proposed Affiliate Transactions.* Certain affiliates of the Debtors have announced transactions that involve the acquisition of control of a substantial number of radio stations. While the Debtors do not expect these transactions to interfere with their restructuring, they cannot guarantee that the FCC or third parties will view the transactions as separate or that such transactions will not delay the grant of the above-mentioned FCC approvals.

## H. RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Company may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

## I. LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Company's Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Debtors' liquidation analysis is set forth in Article VII above and under **Exhibit D**.

These risk factors contain certain statements that are "forward looking statements" within the meaning of Section 21E of the Exchange Act and are made pursuant the safe harbor provisions thereof. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Company, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity, or other financing to fund operations, currency exchange rate fluctuations, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies, and other

market and competitive conditions. Holders of Claims and Equity Interests are cautioned that the forward looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward looking statements and the Debtors undertake no obligation to update any such statements.

ARTICLE X
SECURITIES LAW MATTERS

A.    PLAN SECURITIES

Pursuant to the Plan, in full satisfaction and discharge of their Prepetition Credit Facility Claims, holders of Prepetition Credit Facility Claims will receive the right to receive New Holdings Equity, New Holdings Warrants, and New Term Notes pursuant to the requirements set forth in the Plan (collectively, the "**Plan Securities**").

B.    ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN

1.    Solicitation of Votes Prior to Commencement of the Chapter 11 Cases

The Debtors relied on section 4(2) of the Securities Act and, to the extent applicable, Regulation D promulgated thereunder and, with respect to state securities laws, section 18 of the Securities Act, and, to the extent available, section 1145(a) of the Bankruptcy Code to exempt from the registration requirements of the Securities Act any offer or sale of the Plan Securities deemed to occur pursuant to the Solicitation prior to the Petition Date.

2.    Exemption from Registration Following the Petition Date

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from the registration requirements of the Securities Act any offer or sale of the Plan Securities pursuant to the Plan. Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon this exemption, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

3.    Resales of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the

Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the Plan Securities by persons deemed to be "underwriters" (which definition includes "controlling persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular person would be deemed to be an "underwriter" (including whether such person is a "controlling person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular person may be an "underwriter," the Debtors make no representations concerning the right of any person to freely resell Plan Securities. Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## ARTICLE XI
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Company and Reorganized AR Holdings and to certain holders of Prepetition Credit Facility Claims. The following summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder (the "**Regulations**"), judicial decisions and published administrative rules and pronouncements of the U.S. Internal Revenue Service (the "**IRS**") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Company has not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. This summary does not address non-U.S., state or local tax consequences of the Plan, and does not address any estate and gift tax issues. In addition, except as specifically indicated below, this summary does not address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as persons who are related to the Company within the meaning of the Tax Code, non-U.S. taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Prepetition Credit Facility Claims or Holdings Equity Interests or who will hold the New Term Notes, New Holdings Equity or New Holdings Warrants as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark to market method of accounting, and holders of Prepetition Credit Facility Claims

who are themselves in bankruptcy). Furthermore, this discussion only addresses holders of Prepetition Credit Facility Claims, and assumes that holders of Prepetition Credit Facility Claims hold only Claims in a single Class. Holders of Prepetition Credit Facility Claims should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular holder of a Prepetition Credit Facility Claim. Each holder of a Prepetition Credit Facility Claim should seek advice from its own independent tax advisors concerning the U.S. federal, state, local, non-U.S. income and other tax consequences of the Plan to them in light of its particular circumstances.

This discussion assumes that the various debt and other arrangements to which the Company is a party will be respected for U.S. federal income tax purposes in accordance with their form.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Prepetition Credit Facility Claim.

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the Tax Code. Tax advice contained in this Disclosure Statement (including any attachments) is not written to support the promotion, marketing or promotion of the transactions or matters addressed by the Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

## A.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE COMPANY AND REORGANIZED AR HOLDINGS

As discussed below, the Company expects all of its net operating loss ("NOL") carryforwards to be eliminated upon implementation of the Plan. In addition, the Reorganized AR Holdings' subsequent utilization of any remaining tax attributes may be restricted as a result of and upon the implementation of the Plan.

### 1.    Gain or Loss; Reduction of NOLs

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes, such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets, by the amount of any cancellation of indebtedness ("COD") income realized upon consummation of the Plan and excluded from gross income under Section 108 of the Tax Code ("**Excluded COD Income**"), subject to certain limitations. COD income is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction). The reduction occurs after the determination of the debtor's taxable income, gain or loss for the taxable year in which the COD income occurred, taking into account the use of any or all of such attributes in making that determination.

As a result of Consummation of the Plan, the Company expects to realize substantial COD income with respect to the exchange of the New Holdings Equity, New Holdings Warrants and New Term Notes in satisfaction of the Prepetition Credit Facility Claims, and further expects that such COD income will be Excluded COD Income. Thus, the Company will be required to reduce any NOLs (including any NOL carryforwards) remaining after the determination of taxable income of its consolidated group for the year, taking into account any gain or loss on the distribution of CMP Susquehanna Radio Holdings Corp. stock, to the extent of its Excluded COD income. The extent of such Excluded COD Income and resulting tax attribute reduction will depend significantly on both the value of the New Holdings Equity and New Holdings Warrants, and the issue price of the New Term Notes. Based on the estimated reorganization value of Reorganized AR Holdings, it is anticipated that all of the NOLs of the Company will be eliminated and Reorganized AR Holdings may also be required to reduce its basis in its assets. Under a special rule provided in Section 1017(b)(2) of the Tax Code, Reorganized AR Holdings will not be required to reduce the basis of its assets below the amount of its debt upon consummation of the Plan.

## 2.    Limitation on Tax Attributes

Following the implementation of the Plan, any remaining tax attributes of Reorganized AR Holdings, such as built-in losses if the Company has a "net unrealized built-in loss" in its assets, allocable to periods prior to the Effective Date, will be subject to limitation under Section 382 of the Tax Code as a result of an "ownership change" of Reorganized AR Holdings by reason of the transactions pursuant to the Plan. In general, a corporation's "net unrealized built-in loss" is deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Company does not anticipate that Reorganized AR Holdings will be in a net unrealized built-in loss position.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change pursuant to a bankruptcy plan of reorganization would be subject is equal to the product of (a) the fair market value of the stock of the loss corporation immediately after the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, approximately 3.5%). The annual limitation under section 382 may represent the amount of certain built-in losses, recognized within the five-year period following the ownership change, that may be used each year to offset income. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

## 3.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies if former stockholders and "qualified" (so-called "old and cold") creditors of a company in bankruptcy receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed Chapter 11 plan and the reorganized debtor elects to apply the exception (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of the amount of debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and Reorganized AR Holdings undergoes another ownership change within two years after Consummation of the Plan, then Reorganized AR Holdings' Pre-Change Losses would be eliminated in their entirety.

In the present case, the Company does not believe that Section 382(l)(5) is applicable. Even if this exception were available, Reorganized AR Holdings might elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made on Reorganized AR Holdings' U.S. federal income tax return for the taxable year in which the ownership change occurs.

## 4.    Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular U.S. federal income tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

If a corporation undergoes an ownership change, within the meaning of Section 382 of the Tax Code, and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

**B.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF PREPETITION CREDIT FACILITY CLAIMS**

    **1.  Exchange of Prepetition Credit Facility Claims for New Holdings Equity, New Holdings Warrants, and New Term Notes**

        **a.  Whether Prepetition Credit Facility Claims Constitute "Securities" for U.S. Federal Income Tax Purposes**

Pursuant to the Plan, in full satisfaction and discharge of their Prepetition Credit Facility Claims, holders of Prepetition Credit Facility Claims will receive New Holdings Equity, New Holdings Warrants, and New Term Notes. The U.S. federal income tax consequences of the Plan to such holders of Prepetition Credit Facility Claims will depend, in part, on whether the Prepetition Credit Facility Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of five years or less is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the nature and amount of collateral, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued.

If a holder's Prepetition Credit Facility Claims are treated as securities, the exchange of such Prepetition Credit Facility Claims for New Holdings Equity, New Holdings Warrants and New Term Notes should be treated as a recapitalization and therefore a tax-free reorganization under the Tax Code. In general, this means that a holder of a Prepetition Credit Facility Claim would not recognize loss with respect to the exchange and would not recognize gain except with respect to accrued but unpaid interest on the Prepetition Credit Facility Claims. The holder would obtain an aggregate U.S. federal income tax basis in the New Holdings Equity, New Holdings Warrants and New Term Notes equal to the U.S. federal income tax basis of the Prepetition Credit Facility Claims exchanged therefore. The holder would have a holding period for the New Holdings Equity, New Holdings Warrants, and New Term Notes that includes the holding period for the Prepetition Credit Facility Claims; provided that the tax basis of any New Holdings Equity, New Holdings Warrants, and New Term Notes treated as received in satisfaction of accrued interest would equal the amount of such accrued interest, and the holding period for such New Holdings Equity, New Holdings Warrants and New Term Notes would not include the holding period of the Prepetition Credit Facility Claims.

If a holder's Prepetition Credit Facility Claims are not treated as "securities" for U.S. federal income tax purposes, the holder should be treated as exchanging its Prepetition Credit Facility Claims for New Holdings Equity, New Holdings Warrants and New Term Notes in a fully taxable exchange. In that case, the holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the New Holdings Equity and New Holdings Warrants, and the issue price of the New Term Notes, received that is not allocable to accrued but unpaid interest and (2) the holder's U.S. federal income tax basis in the Prepetition Credit Facility Claims surrendered by the holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Prepetition Credit Facility Claims were held for more than one year by the holder. To the extent that a portion of the New Holdings Equity, New Holdings Warrants and New Term Notes received in the exchange is allocable to accrued interest, the holder may recognize ordinary income (if not previously included in the holder's gross income). See the discussion of accrued interest below. Conversely, a holder of a Prepetition Credit Facility Claim generally may recognize a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. A holder's U.S. federal income tax basis in the New Holdings Equity and New Holdings Warrants should equal their fair market value as of the Effective Date, and the U.S. federal income tax basis in the New Term Notes should equal their issue price (as defined below in paragraph 2.a). A holder's holding period for the New Holdings Equity, New Holdings Warrants and New Term Notes should begin on the day following the Effective Date.

The Company intends to take the position that the Prepetition Credit Facility Claims are not properly treated as securities for U.S. federal income tax purposes. There is no assurance that such position will be respected by the IRS for U.S. federal income tax purposes.

### b.    Accrued Interest

To the extent that any amount received by a holder of a Prepetition Credit Facility Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of a Prepetition Credit Facility Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Prepetition Credit Facility Claims was previously included in the holder's gross income but was not paid in full by the Company. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the holder of a Prepetition Credit Facility Claim will be attributable to accrued interest is unclear. The Regulations generally treat a payment under a debt instrument first as a payment of accrued and unpaid interest, and then as a payment of principal. However, judicial and administrative decision have, in the context of distressed debt, permitted parties to a debt instrument to agree to an allocation of a payment between interest and principal. The Plan specifies that holders of Prepetition Credit Facility Claims will receive distributions with respect to principal to the full extent thereof before any distributions with respect to accrued but unpaid interest. Whether this allocation will be respected for U.S. federal income tax purposes is not clear.

### c.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of the gain realized by a holder of a Prepetition Credit Facility Claim who exchanges the Prepetition Credit Facility Claim for New Holdings Equity, New Holdings Warrants, and New Term Notes, on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the Prepetition Credit Facility Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted U.S. federal income tax basis in the debt instrument is less than (1) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" (generally, interest based on a fixed rate, and payable unconditionally at fixed periodic intervals of 1 year or less during the entire term of the debt instrument) or (2) in the case of a debt instrument issued with original issue discount, its adjusted issue price. Under a de minimis rule, market discount is deemed to be zero unless it is at least equal to 0.25% of the sum of all remaining payments to be made on the Prepetition Credit Facility Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity.

Any gain recognized by a holder on the taxable disposition of Prepetition Credit Facility Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that "accrued" thereon while such Prepetition Credit Facility Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). In general, market discount on a debt instrument accrues ratably on a daily basis from the day following the date of purchase to maturity. To the extent that the surrendered Prepetition Credit Facility Claims that had been acquired with market discount are deemed to be exchanged for New Holdings Equity, New Holdings Warrants and New Term Notes in a tax free reorganization, any market discount that accrued on such debts but was not recognized by the holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of the New Holdings Equity to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Prepetition Credit Facility Claim.

### d.    Limitation on Use of Capital Losses

Holders of Prepetition Credit Facility Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses

from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

2.  Ownership and disposition of the New Term Notes, New Holdings Warrants, and New Holdings Equity

a.  Interest and Original Issue Discount on the New Term Notes

The New Term Notes will be treated as issued with original issue discount ("OID"). In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount. The "stated redemption price at maturity" on a New Term Note is the sum of all payments provided by the debt instrument other than "qualified stated interest." Because interest payments in respect of the New Term Notes will be paid in-kind, the interest paid in respect of the New Term Notes will not be qualified stated interest.

The "issue price" of the New Term Notes will depend upon whether they are traded on an "established securities market" during the sixty (60) day period ending thirty (30) days after the Effective Date, or whether a significant portion of the Prepetition Credit Facility Claims exchanged for such notes is so traded. Pursuant to Regulations, an "established securities market" need not be a formal market. It is sufficient that the notes appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, or that price quotations for such notes are readily available from brokers, dealers or traders. It is not anticipated that the New Term Notes will be regarded as traded on an established securities market (nor that a significant portion of the Prepetition Credit Facility Claims to be exchanged for such notes will be so traded). However, in the event that the New Term Notes are so treated, the issue price of each class of the New Term Notes generally would be the fair market value of such New Term Notes (as determined based on trading values).

In the event that neither the New Term Notes nor a significant portion of the Prepetition Credit Facility Claims exchanged for such notes are traded on an established securities market, the issue price of each class of the New Term Notes generally will be its stated principal amount.

Because the New Term Notes will be issued with OID, a holder of a New Term Note generally will be required to accrue the OID in respect of the New Term Note and include such amount in gross income as interest over the term of such New Term Note based on the constant yield method. Accordingly, a holder of a New Term Note generally will be required to include amounts in gross income in advance of the payment of cash in respect of such income. A holder's U.S. federal income tax basis in a New Term Note will be increased by the amount of any OID included in income and reduced by any cash received (other than payments of qualified stated interest) with respect to such note.

b.  Sale, Exchange or Redemption of New Term Notes

Unless a non-recognition provision applies, a holder of a New Term Note generally will recognize gain or loss upon the sale, exchange or redemption of the New Term Note equal to the difference, if any, between the holder's adjusted U.S. federal income tax basis in the note and the amount realized on the sale, exchange or redemption. Any gain or loss generally will be capital gain or loss (subject to the market discount rules discussed below).

c.  Acquisition and Bond Premium

If a person acquires a New Term Note (generally other than at original issue) for an amount that exceeds the issue price of such note, but is less than or equal to the unpaid principal amount of such note, the amount of OID includable in the holder's gross income generally is reduced in each period in proportion to the percentage of the OID represented by the excess basis. Alternatively, if a holder elects to treat all stated interest and discount as OID,

such holder may elect to recompute the OID accruals by treating its acquisition as a purchase at original issue and applying the constant yield method. Such an election may not be revoked without the consent of the IRS.

If a holder has a tax basis in any of the New Term Notes received that exceeds the unpaid principal amount of such notes (i.e., a "bond premium"), the holder will not include any of the OID in income. Moreover, a holder may elect to deduct any bond premium over the period from its acquisition of such note to the maturity date of such note (or, if it results in a smaller amount of amortizable bond premium, until an earlier call date), but not in excess of the stated interest. If such bond premium is amortized, the amount of stated interest on any New Term Note that must be included in the holder's gross income for each period ending on an interest payment date or at the maturity date, as the case may be, will (except as Regulations may otherwise provide) be reduced by the portion of bond premium allocable to such period based on the note's yield to maturity. The holder's tax basis in its New Term Note will be reduced by a like amount. If such an election to amortize bond premium is not made, a holder will receive a tax benefit from the premium only in computing such holder's gain or loss upon the sale or other taxable disposition of the New Term Note, or upon the full or partial payment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all notes and other bonds the interest on which is includable in the holder's gross income and that are held at, or acquired after, the beginning of the holder's taxable year as to which the election is made. The election may be revoked only with the consent of the IRS.

d.      **Market Discount**

Any person that acquires a New Term Note (generally other than at original issue) for less than the issue price of such note generally will be subject to the "market discount" provisions of the Tax Code (unless such difference is less than a de minimis amount). In addition, as discussed below, a holder of a Prepetition Credit Facility Claim who acquired its Prepetition Credit Facility Claim at a market discount and that receives its New Term Notes as part of a tax-free exchange may be required to carry over to such notes, as well as any New Holdings Equity received, any accrued market discount with respect to its Prepetition Credit Facility Claim to the extent not previously included in income.

Under the market discount rules, a holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other disposition of, a New Term Note as ordinary income to the extent of the market discount that has not previously been included in income and is treated as having accrued on such note at the time of such payment or disposition. A holder could be required to defer the deduction of a portion of the interest expense on any indebtedness incurred or maintained to purchase or to carry a market discount note, unless an election is made to include all market discount in income as it accrues. Such an election would apply to all bonds acquired by the holder on or after the first day of the first taxable year to which such election applies, and may not be revoked without the consent of the IRS.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such New Term Notes to the maturity date of the notes, unless the holder irrevocably elects to compute the accrual on a constant yield basis. This election can be made on a note-by-note basis.

Under proposed Regulations expected to be promulgated by the U.S. Treasury Department, any accrued market discount not treated as ordinary income upon a tax-free exchange of market discount bonds would carry over to the non-recognition property received in the exchange. If such proposed Regulations are promulgated and applicable to the Plan (and, likely, even without the issuance of regulations), any holder of a Prepetition Credit Facility Claim that constitutes a "security" for U.S. federal income tax purposes would carry over any accrued market discount incurred in respect of such Prepetition Credit Facility Claim to any New Holdings Equity and, if treated as a security for U.S. federal income tax purposes, any New Term Notes received for such Prepetition Credit Facility Claim pursuant to the Plan (presumably allocated on the basis of relative fair market value), such that any gain recognized by the holder upon a subsequent disposition of such stock or notes (including a repayment of principal) also would be treated as ordinary income to the extent of any such accrued market discount not previously included in income.

### e. Ownership and Subsequent Sale of New Holdings Equity

A holder of New Holdings Equity will be required to report as ordinary income, any dividends that such holder receives with respect to such New Holdings Equity. Distributions to holders of New Holdings Equity will be treated as dividend income to such holders, to the extent paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. If the holder is a corporation, a dividends received deduction may be available to such holder with respect to any such dividends paid, subject to applicable limitations under the Tax Code. To the extent that the amount of any distribution exceeds Reorganized AR Holdings' current and accumulated earnings and profits for a taxable year, the distribution will first be treated as a tax-free return of capital. Such treatment will cause a reduction in the adjusted U.S. federal income tax basis of the New Holdings Equity (thereby increasing the amount of gain, or decreasing the amount of loss, to be recognized by the holder on a subsequent disposition of the New Holdings Equity). The balance in excess of adjusted basis will be taxed as capital gain.

A holder will recognize gain or loss upon disposition of New Holdings Equity equal to the difference between the amount such holder realizes in connection with the disposition and such holder's tax basis for such New Holdings Equity. Any gain recognized by a holder upon a subsequent taxable disposition of New Holdings Equity received in satisfaction of a Prepetition Credit Facility Claim pursuant to the Plan (or any stock or property received for it in a later tax-free exchange) will be treated as ordinary income to the extent of: (a) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to its Prepetition Credit Facility Claim and any ordinary loss deductions incurred upon satisfaction of its Prepetition Credit Facility Claim, less any income (other than interest income) recognized by the holder upon satisfaction of its Prepetition Credit Facility Claim; and (b) with respect to a cash basis holder, any amount that would have been included in its gross income if the holder's Prepetition Credit Facility Claim had been satisfied in full but that was not included by reason of the cash method of accounting. In addition, as discussed in the preceding section, a holder that receives its New Holdings Equity in exchange for a Prepetition Credit Facility Claim that constitutes a "security" or for U.S. federal income tax purposes may be required to treat all or a portion of any gain recognized as ordinary income under the market discount provisions of the Tax Code.

### f. Ownership and Subsequent Sale of New Holdings Warrants

A holder of a New Holdings Warrant generally will not recognize gain or loss upon exercise, with a holder's tax basis in the stock received upon exercise equal to the sum of the holder's tax basis in the New Holdings Warrant and the exercise price. Reorganized AR Holdings intends to take the position that the New Holdings Warrants constitute stock of Reorganized AR Holdings for U.S. federal income tax purposes consistent with general U.S. federal income tax principles (even though the New Holdings Warrants may not constitute capital stock for purposes of other federal laws). Assuming such a position is correct, a holder's holding period in the stock received upon exercise would include the holder's holding period in the New Holdings Warrant, and any distributions on the New Holdings Warrants would generally be treated for U.S. federal income tax purposes in the same manner as distributions on New Holdings Equity, as discussed above. If Reorganized AR Holdings' position is not correct, then the holder would generally commence a new holding period with respect to the stock received on the date of exercise, and the treatment of distributions on the New Holdings Warrants in such case would be unclear.

Upon the lapse, sale or other taxable disposition of a New Holdings Warrant, the holder will generally recognize capital gain or loss equal to the difference between the amount realized (zero in the case of a lapse) and such holder's adjusted U.S. federal income tax basis in the New Holdings Warrant. Holders of New Holdings Warrants should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers, as discussed above.

### g. Information Reporting and Backup Withholding

Payments of Allowed Prepetition Credit Facility Claims under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding generally applies if a person: (1) fails to furnish its social security number or other taxpayer identification number ("TIN"); (2) furnishes an incorrect TIN; (3) fails properly to report interest or dividend income on his or her personal income tax return and is notified to that effect by the IRS; or (4) under certain circumstances, fails to provide a certified statement, signed

under penalty of perjury, that the TIN provided is its correct number and that it is a U.S. person that is not subject to backup withholding. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return). Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions which establish such exemption.

The Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Regulations and whether the transactions contemplated by the Plan would be subject to these Regulations and require disclosure on the holders' tax returns.

### 3. Considerations Applicable to Non-U.S. Holders of Prepetition Credit Facility Claims

The following describes certain U.S. federal income tax consequences to non-U.S. holders of Prepetition Credit Facility Claims. The term "non-U.S. holder" means a holder who is not (1) a citizen or resident of the United States for U.S. federal income tax purposes, (2) a corporation or a partnership (or entity treated as a corporation or partnership for U.S. tax purposes) created or organized in or under the laws of the United States or any political subdivision thereof (including the District of Columbia), (3) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source, or (4) a trust (a) if a U.S. court can exercise primary supervision over the administration of such trust and one or more U.S. fiduciaries has the authority to control all of the substantial decisions of such trust or (b) that has a valid election in place under the Regulations to be treated as a U.S. person for U.S. federal income tax purposes.

#### a. Exchange of Prepetition Credit Facility Claims for New Holdings Equity, New Holdings Warrants and New Term Notes

A non-U.S. holder of a Prepetition Credit Facility Claim generally will not be subject to U.S. federal income tax with respect to the receipt of New Holdings Equity, New Holdings Warrants, and New Term Notes in exchange for such Prepetition Credit Facility Claim pursuant to the Plan (except to the extent any amount received is deemed to be a payment of interest, in which case rules similar to those described below applicable to the New Term Notes would apply), unless (1) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes; (2) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met; or (3) such holder is an individual who is a former citizen or long-term resident of the United States subject to certain U.S. tax rules relevant to such status.

#### b. Interest on the New Term Notes

If the income or gain on the New Term Notes is "effectively connected with the conduct of a trade or business within the United States" by a non-U.S. holder, such income or gain will be subject to U.S. federal income tax essentially in the same manner as if the New Term Notes were held by a U.S. holder, as described above, and in the case of a non-U.S. holder that is a corporation, may also be subject to U.S. branch profits tax. Such non-U.S. holder will not be subject to withholding taxes, however, if it provides a properly executed Form W-8ECI.

Interest on the New Term Notes held by other non-U.S. holders may be subject to withholding of up to 30% of each payment made to the non-U.S. holders or other payee unless the "portfolio interest exemption" applies. The interest paid on the New Term Notes generally should qualify for the portfolio interest exemption. Accordingly, interest paid on the New Term Notes to a non-U.S. holder should not be subject to withholding if (1) the U.S. person who would otherwise be required to deduct and withhold the tax receives from the non-U.S. holder who is the beneficial owner of the obligation a statement signed by such person under penalties of perjury, certifying that such owner is not a U.S. person on IRS Form W-8BEN (or successor form); (2) such non-U.S. holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of stock in Reorganized AR Holdings; (3) such non-U.S. holder is not a "controlled foreign corporation" (within the meaning of section 957 of the Tax Code) related to Reorganized AR Holdings; and (4) the non-U.S. holder is not a foreign

"bank" receiving the interest on an extension of credit pursuant to a loan agreement entered into in the ordinary course of its trade or business.

If a non-U.S. holder does not claim, or does not qualify for, the benefit of the portfolio interest exemption, the holder may be subject to a 30% withholding tax on interest payments on the New Term Notes. However, non-U.S. holder may be able to claim the benefit of a reduced withholding tax rate under an applicable income tax treaty. The required information for claiming treaty benefits is generally submitted, under current regulations, on Form W-8BEN.

### c.  Sale or other Disposition of the New Term Notes

A non-U.S. holder generally will not be subject to U.S. federal income tax or withholding tax on gain recognized on a sale, exchange, redemption, retirement, or other disposition of the New Term Notes. A non-U.S. holder may, however, be subject to tax on such gain if: (1) it is a nonresident alien individual who was present in the United States for 183 days or more in the taxable year of the disposition and certain other requirements are met; (2) it is an individual who is a former citizen or long-term resident of the United States subject to certain U.S. tax rules relevant to such status; or (3) the gain is effectively connected with the conduct of a U.S. trade or business, as provided in applicable U.S. tax rules.

### d.  Ownership and Subsequent Sale of New Holdings Warrants or New Holdings Equity

A non-U.S. holder of New Holdings Warrants or New Holdings Equity generally will be subject to U.S. federal withholding tax at 30% (or such lower rate as may be provided by an applicable income tax treaty) on the gross amount of any dividends that such non-U.S. holder receives with respect to its New Holdings Warrants or New Holdings Equity. As discussed above, distributions to holders of New Holdings Warrants or New Holdings Equity will be treated as dividend income to such holders, to the extent paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Dividends that are effectively connected with a non-U.S. holder's conduct of a trade or business in the United States and, if a tax treaty applies, attributable to a permanent establishment or fixed base in the United States, generally will not be subject to the 30% withholding tax if the non-U.S. holder files the appropriate IRS form with Reorganized AR Holdings.

A non-U.S. holder of New Holdings Warrants or New Holdings Equity that claims the benefit of an applicable income tax treaty generally will be required to satisfy applicable certification and other requirements prior to the distribution date. Non-U.S. holders should consult their tax advisors regarding their entitlement to benefits under a relevant income tax treaty.

A non-U.S. holder generally will not be subject to U.S. federal income tax or withholding tax on gain recognized on a sale, exchange, redemption, retirement, or other disposition of New Holdings Warrants or New Holdings Equity. A non-U.S. holder may, however, be subject to tax on such gain if: (1) it is a nonresident alien individual who was present in the United States for 183 days or more in the taxable year of the disposition; (2) it is an individual who is a former citizen or long-term resident of the United States subject to certain U.S. tax rules relevant to such status; (3) the gain is effectively connected with the conduct of a U.S. trade or business, as provided in applicable U.S. tax rules; or (4) Reorganized AR Holdings is or has been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the non-U.S. holder held New Holdings Warrants or New Holdings Equity (the "applicable period").

Generally, a corporation is a "U.S. real property holding corporation" if the fair market value of its "U.S. real property interests" equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business. Reorganized AR Holdings believes that it is not currently, and is not likely to become, a U.S. real property holding corporation for U.S. federal income tax purposes in the future.

A non-U.S. holder of a New Holdings Warrant generally will not recognize gain or loss upon exercise, with the holder's tax basis in the stock received upon exercise equal to the sum of the holder's tax basis in the New Holdings Warrant and the exercise price. Reorganized AR Holdings intends to take the position that the New

Holdings Warrants constitute stock of Reorganized AR Holdings for U.S. federal income tax purposes consistent with general U.S. federal income tax principles (even though the New Holdings Warrants may not constitute capital stock for purposes of other federal laws). Assuming such a position is correct, a holder's holding period in the stock received upon exercise would include the holder's holding period in the New Holdings Warrant, and any distributions on the New Holdings Warrants would generally be treated for U.S. federal income tax purposes in the same manner as distributions on New Holdings Equity, as discussed above. If Reorganized AR Holdings' position is not correct, then the holder would generally commence a new holding period with respect to the stock received on the date of exercise, and the treatment of distributions on the New Holdings Warrants in such case would be unclear.

### e.    Information Reporting and Backup Withholding

Payments of interest or principal on the New Term Notes, and dividends or other distributions on the New Holdings Equity and New Holdings Warrants, may be subject to both backup withholding (at the applicable rate) and information reporting. Backup withholding and information reporting generally will not apply to payments on the New Term Notes, New Holdings Equity and New Holdings Warrants if the non-U.S. holder certifies, on a Form W-8BEN, or successor form, that it is not a U.S. person, provided that the payor does not have actual knowledge that the non-U.S. holder is, in fact, a U.S. person. Amounts withheld under the backup withholding rules may be refunded or credited against the non-U.S. holder's U.S. federal income tax liability, if any, provided that the required information is furnished to the IRS.

## C.    FCC Trust

Pursuant to the Plan, if the FCC Trust is established, in lieu of distributing New Holdings Equity or New Holdings Warrants to certain holders of Prepetition Credit Facility Claims, the Reorganized AR Holdings may (i) contribute the New Holdings Equity and New Holdings Warrants to the FCC Trust and (ii) subsequently issue beneficial interests in the FCC Trust to such holders. The Company intends that the FCC Trust will qualify as a "liquidating trust" and as a "grantor trust" for U.S. federal income tax purposes. If the FCC Trust so qualifies, then for all U.S. federal income tax purposes, the Reorganized AR Holdings will be deemed to have distributed to the holders of the Prepetition Credit Facility Claims an undivided interest in their pro rata shares of the assets of the FCC Trust (i.e., the New Holdings Equity or New Holdings Warrants) and such holders will be deemed to have contributed such interests to the FCC Trust in exchange for beneficial interests in the FCC Trust.

The U.S. federal income tax consequences to the Reorganized AR Holdings of distributing beneficial interests in the FCC Trust to certain holders of Prepetition Credit Facility Claims should be identical to the consequences to the Reorganized AR Holdings of distributing the New Holdings Equity and New Holdings Warrants discussed above. The U.S. federal income tax consequences to a holder of a Prepetition Credit Facility Claim resulting from the exchange of such holder's Prepetition Credit Facility Claim for a beneficial interest in the FCC Trust should mirror the consequences, described above, had such holder received its pro rata shares of the assets of the FCC Trust (i.e., New Holdings Equity or New Holdings Warrants) in exchange for such holder's Prepetition Credit Facility Claim. A holder of a Prepetition Credit Facility Claim should not recognize gain or loss on the deemed contribution of the assets of the FCC Trust (i.e., the New Holdings Equity or New Holdings Warrants) to the FCC Trust. Upon a holder's actual receipt of assets from the FCC Trust, the holder should not recognize any gain or loss.

The FCC Trust Agreement will require tax returns to be filed with the IRS for the FCC Trust as a grantor trust and that each beneficiary of the FCC Trust be sent a separate statement setting forth the beneficiary's allocable share of items of income, gain, loss, deduction or credit (if any) and will instruct the beneficiary to report such items on such beneficiary's federal income tax return. This requirement may result in any such holder of a Prepetition Credit Facility Claim being subject to tax on its allocable share of the FCC Trust's taxable income (if any) prior to receiving any distributions from the FCC Trust.

It is possible that the IRS could require an alternative characterization of the FCC Trust, which could result in different, and possibly greater, tax liability to the FCC Trust and/or holders of Prepetition Credit Facility Claims that receive a beneficial interest in the FCC Trust. A holder of a Prepetition Credit Facility Claim that receives a beneficial interest in the FCC Trust is urged to consult its own tax advisors regarding the tax consequences of the right to receive and of the receipt of property from the FCC Trust.

*     *     *     *     *

      The U.S. federal income tax consequences of the Plan are complex. The foregoing summary is included herein for general information only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder in light of such holder's particular circumstances and income tax situation. Holders of Prepetition Credit Facility Claims should consult with their own tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any U.S. federal, state, local, or non-U.S. tax laws and of any change in applicable tax laws.

**ARTICLE XII**
**CONCLUSION AND RECOMMENDATION**

      The Company believes the Plan is in the best interests of all holders of claims and equity interests and urges the holders of Claims entitled to vote to accept the Plan.

Wilmington, Delaware
Dated: October 28, 2011

> AR Broadcasting Holdings, Inc. (for itself and all other Debtors)
>
> By: /s/ _____
> Its: _____

Prepared By:

> LANDIS RATH & COBB LLP
> Adam G. Landis (No. 3407)
> William E. Chipman, Jr. (No. 3818)
> 919 Market Street, Suite 1800
> Wilmington, DE 19801
>
> Telephone:    (302) 467-4400
> Facsimile:     (302) 467-4450
>
> Proposed Counsel for the Debtors
> and Debtors in Possession